# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

ARTHUR HERBERT DEARING, III,
            *Defendant-Appellant.*

No. 06-30606

D.C. No.
CR-05-00216-WLO

OPINION

Appeal from the United States District Court
for the District of Idaho
William L. Osteen, District Judge, Presiding

Argued and Submitted
August 8, 2007—Seattle, Washington

Filed September 25, 2007

Before: William C. Canby, Jr., Cynthia Holcomb Hall, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Hall

13127

**COUNSEL**

Scott C. Williams and Jon D. Williams, Salt Lake City, Utah, for the appellant.

Wendy J. Olson, Assistant United States Attorney, Boise, Idaho, for the appellee.

**OPINION**

HALL, Senior Circuit Judge:

   Arthur Herbert Dearing III appeals his conviction on thirty-two counts of aiding and abetting health care fraud, in violation of 18 U.S.C. § 1347, arising from a scheme to defraud Idaho Medicaid by submitting false billings from a mental

health clinic that Dearing owned and operated with his brother. The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

## I.    Background

In December 2001 Arthur Dearing ("Art" or "Dearing") and his brother Rodger opened a mental health clinic called Life Springs Mental Health L.L.C. in Nampa, Idaho. The facility was designed to provide services to patients at Valley Plaza, a residential care facility that Rodger owned. Rodger was a registered nurse but lacked prior mental health experience. He ran the clinic's day-to-day operations along with Greg Hassakis, a mental health consultant hired to set up the program. Art, whose background was in civil engineering, served as part-owner and visited the facility once or twice a month for business meetings.

Life Springs' business model depended upon billing Medicaid for the care provided to its patients for revenue. To that end, Art executed a Medicaid Provider agreement on behalf of Life Springs. This agreement included a contract between Life Springs and licensed physician Dr. Frances Wregglesworth, who agreed to provide supervising physician services. Art signed the contract with Dr. Wregglesworth on behalf of the company. The application also included a note, affixed to the Wregglesworth contract, indicating that Medicaid employee Jack Weinberg informed Art that a licensed physician must sign all treatment plans, and that Art acknowledged the requirement. After the application was approved, Art provided a copy of Medicaid's billing rules and regulations to Kathy McKenney, who served as administrator of the Valley Plaza facility and would initially handle Medicaid billing for Life Springs.

In October 2002, Medicaid investigator Greg Snider audited Life Springs. In an exit interview, he explained to Art

and Rodger that the audit identified three improper billing practices: (1) billing for services performed by employee Mike Adamson, who lacked the necessary qualifications to provide Medicaid-funded services; (2) billing for services provided without a treatment plan signed by a physician; and (3) billing for services provided outside the Life Springs facility.

Although the audit put Art on official notice of problems with Life Springs' billing practices, it was not the first time that these issues had been brought to his attention. McKenney testified that she regularly provided Art with information regarding Medicaid billings and had raised each of these three issues with Art during early 2002. Greg Hassakis also testified that he had raised these issues prior to the audit at staff meetings where Art was present. At each of these meetings, Rodger assured the staff that he had checked the appropriate regulations and that the company's practices were legal. As the audit approached, however, Art and Rodger held a meeting at a local restaurant with Hassakis, McKenney and another employee at which Rodger asked Hassakis to "take the fall" for any illegal behavior that the audit would uncover. Hassakis promptly rose and left the restaurant. Although Art claims that he did not hear Rodger's statement, the other participants testified that he was in close proximity and was actively participating in the discussion when the comment was made.

Life Springs continued its fraudulent business practices even following the October 2002 audit. For example, Art hired Marge Stallings in December 2002 to correct Life Springs' billing problems. She quickly brought to Art's attention that the company continued to bill illegally for Adamson's services, for services provided without a treatment plan, and for services provided off the premises. Art convened a meeting at which Rodger warned Stallings that "loose lips sink ships." Art assured Stallings that he would correct these billing issues, but when he took no additional action, Stallings

quit. Similarly, Life Springs employees Wendy Reynolds and Krissy Munson informed Art that the company was still engaging in fraudulent billing practices. In response to Reynolds' concerns, Art warned her that Rodger felt she was focusing too much on legal issues and not enough on the business side.

Medicaid continued to investigate the company throughout 2003 and early 2004. Investigator Eileen Williams testified that during a July 24, 2003, phone interview, Art disclosed to Williams that he was considering removing Rodger from the business and wanted to know how it would affect the investigation. Williams interviewed Art in greater depth on April 16, 2004, during which he acknowledged Life Springs' past problems but claimed that he thought Rodger had corrected them.

On October 13, 2005, Art, Rodger, and Adamson were indicted on fifty counts of aiding and abetting health care fraud in violation of 18 U.S.C. § 1347, based upon Life Springs' fraudulent billing practices as discussed in the October 2002 audit. A superseding indictment included only forty counts. Rodger pled guilty prior to trial, and Adamson pled guilty to one misdemeanor count on the third day of trial, so only Art proceeded to a verdict. The jury found Art guilty on thirty-two of the forty counts, acquitting him for conduct before the October 2002 audit but convicting him for all conduct after that date. Art received a five-month sentence on each count, to run concurrently, and timely appealed.

## II.  Standard of Review

We review de novo the district court's denial of a motion for judgment of acquittal based on insufficient evidence. *United States v. Carranza*, 289 F.3d 634, 641 (9th Cir. 2002). Our review of the underlying jury verdict, however, is "highly deferential." *United States v. Terry*, 911 F.2d 272, 278 (9th Cir. 1990). "The evidence is sufficient to support a conviction if, 'viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Milwitt*, 475 F.3d 1150, 1154 (9th Cir. 2007) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). We review the district court's formulation of a jury instruction for abuse of discretion, although we review de novo the question whether a jury instruction misstates an element of the crime. *United States v. Chastain*, 84 F.3d 321, 323 (9th Cir. 1996); *United States v. Tagalicud*, 84 F.3d 1180, 1183 (9th Cir. 1996).

### III.  Discussion

*A.  Sufficiency of the Evidence*

**[1]** Dearing first argues that the evidence adduced at trial is insufficient because there is no evidence that he acted with willful intent. Dearing was convicted of violating 18 U.S.C. § 1347, which provides that one commits health care fraud when he:

> knowingly and willfully executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud any health care benefit program; or
>
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money . . . owned by . . . any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items or services.

"As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.' In other words, in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with

knowledge that his conduct was unlawful.' " *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (footnote omitted) (quoting *Ratzlaf v. United States,* 510 U.S. 135, 137 (1994)). To prove that the defendant acted as an aider and abetter, the government must show that the defendant knowingly provided substantial assistance to another's violation. *United States v. Kessi*, 868 F.2d 1097, 1103 (9th Cir. 1989).

**[2]** As we have acknowledged in connection with other statutes containing a willfulness requirement, "direct proof" of one's specific wrongful intent is "rarely available." *United States v. Marabelles*, 724 F.2d 1374, 1379 (9th Cir. 1984). But willfulness may be inferred from circumstantial evidence of fraudulent intent. *Id.* at 1379-80; *see also United States v. Tucker*, 133 F.3d 1208, 1218 (9th Cir. 1998). A recent Sixth Circuit opinion has applied this reasoning to a section 1347 conviction similar to this case, explaining that "[i]ntent can be inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (internal quotation marks and citation omitted). *Davis* held that a jury could infer willful intent to defraud where the defendant owned the company, hired and fired employees, frequently visited the offices where the fraudulent conduct occurred, was present during a session where fraudulent activity took place, and covered up evidence of the fraudulent conduct. *Id.* at 549-50.

**[3]** We similarly conclude that the evidence supports a finding that Dearing willfully participated in Life Springs' fraudulent billing scheme. Specifically, a reasonable juror could have found that Art was put on notice of Life Springs' fraudulent billing practices by the October 2002 audit, knew that the company continued these practices after the audit, yet took no action to correct these actions and, in fact, dissuaded serious investigation into the company's problems, all while continuing to profit from the company's illegal conduct. Art's knowledge of the company's ongoing fraud was established

by the testimony of Stallings, Munson, and Reynolds, each of whom raised ongoing billing issues with Art after the audit was completed.[1] In addition, the jury could have found knowledge of the company's continuing illegal practices based upon Art's presence at meetings in which Rodger warned Stallings that "loose lips sink ships" in response to her billing concerns.

[4] The jury could also have inferred willful intent from Art's misrepresentations and efforts to conceal the activity. Despite his knowledge of these ongoing transgressions, Art told investigator Williams that he was unaware of any ongoing fraudulent billing. Art also personally discouraged Reynolds from pursuing her billing concerns with the admonition that she was looking too much at the legal side and not enough at the business side. And although he ostensibly hired Stallings to correct the problems identified in the audit, he disregarded her repeated warnings about ongoing fraud and eventually let her quit rather than implement the changes she recommended. While Art apparently considered firing Rodger in mid-2003—a fact that itself suggests knowledge of the ongoing fraud—he ultimately declined to do so. He also did not terminate his own stake in the business, instead continuing to share the company's profits equally with his brother.

[5] When evaluating the sufficiency of the evidence, this court asks not "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt," but rather whether "*any* rational trier of fact" could do so. *Jackson*, 443 U.S. at 318-19 (emphasis in original). As in the Sixth Circuit's *Davis* opinion, the evidence shows that Art had knowledge of the ongoing fraud and misrepresented or covered up inquiries into that fraud, while continuing to profit from the venture. On these facts, we conclude that a reasonable juror

---

[1]Art's knowledge may also be inferred from the fact that McKenney regularly provided Art with billing information. McKenney's successor, Dana Vanderbrink, acknowledged doing the same at least once during August or September of 2003.

could have inferred that Art willfully participated in the scheme to defraud Medicare.

## B. *Jury Instructions*

Dearing also claims that the district court erred in permitting a jury instruction that allowed a finding of guilt based upon reckless indifference rather than willful intent. We find this argument unavailing. The district court instructed the jury that it could not convict Dearing unless it found beyond a reasonable doubt, as the first element of the crime, "that the defendant knowingly and willingly executed, or attempted to execute a scheme to defraud any healthcare benefit program." It then defined "willfully" as meaning "that the act was committed voluntarily and purposely with the specific intent to do something the law forbids. That is to say, with bad purpose either to disobey or to disregard the law, and not through ignorance, mistake, or accident." Therefore the instructions correctly stated that the jury could not find Dearing guilty unless it concluded that he specifically intended to act with a bad purpose in executing a scheme to defraud Medicaid.

Dearing seemingly does not challenge this conclusion, but instead asserts that a second instruction effectively lowered the mens rea requirement from willfulness to recklessness. In addition to the instruction given above, the district court *also* stated that the jury had to find beyond a reasonable doubt that "the defendant acted with intent to defraud." The instruction defined "intent to defraud" as acting "knowingly and with the specific intent to deceive or cheat." Because "[d]irect proof of knowledge and fraudulent intent—of what a person is thinking—is almost never available . . . [t]he state of mind of the defendant may be proved by circumstantial evidence" and can be met either "by showing that the defendant knowingly lied with intent to defraud" or that he "acted with reckless indifference to the truth or falsity of the statements."

**[6]** We hold that the phrasing of this additional instruction was not erroneous and did not effectively relieve the government of its burden of proving that Dearing's actions were willful. The "intent to defraud" element is common to the federal fraud statutes. We have repeatedly held that the intent to defraud may be proven through reckless indifference to the truth or falsity of statements. *United States v. Munoz*, 233 F.3d 1117, 1136 (9th Cir. 2000) (mail fraud); *United States v. Ely,* 142 F.3d 1113, 1121 (9th Cir. 1997) (bank fraud). We have also upheld a reckless indifference instruction in connection with securities fraud, which, like section 1347, requires that the defendant acted willfully: we explained that "a defendant could 'willfully' violate § 78ff by willfully acting with reckless indifference to the truth of statements made in the course of the fraud." *United States v. Tarallo*, 380 F.3d 1174, 1189 & n.5 (9th Cir. 2004).[2] More importantly, the "reckless indifference" instruction that Dearing challenges was tethered to the "specific intent to defraud" element, which the government was required to prove *in addition to* the first element. Therefore its inclusion did not negate the separate instruction that to convict, the jury had to find that Dearing acted "knowingly and willfully."

**[7]** "In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are adequate to guide the jury's deliberation." *Munoz*, 233 F.3d at 1130. Because we have previously held that the government may prove willfulness by showing that the defendant acted with reckless indifference to the truth or falsity of a statement, and because the "reckless indifference" instruction here did not negate the separate "knowing and willfully" instruction, we find no error. Reviewed as a whole, the instructions adequately conveyed

---

[2]Similarly, the Sixth Circuit in *Davis* noted that the judge instructed the jury that "false or fraudulent pretenses, representations, or premises" under Section 1347 may be established by material false statements that "were either known to be untrue when made or made with reckless indifference to their truth." *Davis*, 490 F.3d at 547.

that conviction required the jury to find that Dearing acted "voluntarily and purposely" with "bad purpose either to disobey or disregard the law, and not through ignorance, mistake, or accident."

Arthur Dearing's conviction is therefore

**AFFIRMED.**