**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

        v.

JAMES MINCOFF, aka Jim,
        *Defendant-Appellant.*

No. 08-50058

D.C. No.
CR-06-01241-DMS-
3

OPINION

Appeal from the United States District Court
for the Southern District of California
Dana M. Sabraw, District Judge, Presiding

Argued and Submitted
April 14, 2009—Pasadena, California

Filed July 31, 2009

Before: William C. Canby, Jr., Johnnie B. Rawlinson and
N. Randy Smith, Circuit Judges.

Opinion by Judge Rawlinson

9983

**COUNSEL**

Charles M. Sevilla, San Diego, California, for defendant-appellant James Mincoff.

Karen P. Hewitt, United States Attorney, Bruce R. Castetter, Assistant United States Attorney, and David D. Leshner (argued), Assistant United States Attorney, San Diego, California, for plaintiff-appellee United States.

**OPINION**

RAWLINSON, Circuit Judge:

Appellant James Mincoff (Mincoff) challenges his conviction and sentence for conspiracy to distribute cocaine, attempt to distribute cocaine, and unlawful use of a communication facility in violation of 21 U.S.C. §§ 841(a)(1), 846, and 843(b).

## I. BACKGROUND

Mincoff and Jessie Munoz (Munoz)[1] met through a mutual

---

[1] Munoz was originally one of four named defendants, but he entered a guilty plea and agreed to cooperate with the government. He was the main government witness at trial.

friend during the late 1990s. Mincoff called Munoz in April or May, 2004, to ask whether Munoz had access to cocaine. Mincoff ordered eight kilograms of cocaine from Munoz. Because Munoz had never dealt cocaine before, he called Kenny Vega (Vega), his "meth connection," to help him obtain the cocaine. Vega was only able to supply Munoz with five kilograms of cocaine rather than the requested eight. Two or three days after Mincoff placed the order, Vega's driver "the Engineer" delivered the cocaine to Munoz's home.

Munoz called Mincoff to inform him that the cocaine had arrived, and Mincoff arrived within the hour to retrieve the drugs. Mincoff and Munoz agreed that Mincoff would take the cocaine to his customer and return with payment, which he did. Once Munoz received the purchase money from Mincoff, he paid Vega's driver. Future transactions between Mincoff and Munoz remained a possibility, provided that Mincoff's buyers returned.

In the course of a different investigation, the government received court authorization to wiretap two of Munoz's cellular telephones. Multiple calls between Munoz and Mincoff were intercepted as a result of these wiretaps.

*July 24, 2005 Telephone Call*

Mincoff contacted Munoz about a cocaine sale at 2:18 p.m. Mincoff explained, "[m]y one buddy called me, he's gonna be in town this week . . . [a]nd he is wondering if we can, uh, put like six of those together." FBI Special Agent Allan Vitkosky testified that this statement "means to attempt to obtain 6 kilograms of cocaine." Munoz also testified that he understood that Mincoff wanted to purchase six kilograms of cocaine on behalf of his buyer. Mincoff guaranteed Munoz that six of the kilograms would be sold, and maybe a seventh as well.

*July 25, 2005 Telephone Calls*

Munoz called Vega at 1:45 p.m. and asked whether he had been in touch with the Engineer because "[t]hey asked me for

six of those things for this week." Munoz and Vega spoke again two minutes later, and Munoz affirmed that "they need 6 of them, maybe 7 but 6 for sure."

*July 27, 2005 Telephone Calls*

At 9:51 a.m., Mincoff informed Munoz that his "guy's here" and that he wanted to "knock [the transaction] out if not this afternoon, first thing in the morning." At 1:33 p.m., Mincoff pressured Munoz to complete the deal, "['c]ause these guys got ants in their pants, they're wanting to do it like right now." In a 7:00 p.m. call, Mincoff indicated that "nobody's gonna wait much longer" and that "[t]wo different guys came together and one of them is already bailing." He also said, "[w]e'll do three of them, I mean if uh. I mean I need to try and do them tonight. Like now." In an 8:18 p.m. call, Mincoff instructed Munoz that "we can do three (3) of em right now" and "[c]all me in the morning, I'll be here and I got my guys here right now."

*July 28, 2005 Telephone Calls*

During a call at 10:40 a.m., Mincoff told Munoz, "my guy is sitting right here and we need those . . . [h]e's got the paperwork for three (3), he's ready to roll." Munoz testified that he understood Mincoff to mean that his buyer had the money for three kilograms of cocaine. Munoz also understood that Mincoff was not purchasing the cocaine for his own use, but to fill the order placed by his customer. During a call at 1:28 p.m., Mincoff told Munoz "we're going to miss the boat" because "[t]his guy's got to leave." Mincoff directed Munoz to "lock on one for Tuesday, he's going to come back through . . . [j]ust for one (1)." According to Munoz, this portion of the conversation referred to there being "one more guy that wanted 1 kilo left."

Police Detective Barry Sweeney (Sweeney) was performing surveillance on Mincoff's residence on the morning of

July 28, 2005. Sweeney noticed an individual exit and reenter the residence. This individual was later identified as David Laverne Lincoln (Lincoln). Lincoln was probably one of Mincoff's buyers, because Mincoff indicated that his buyer was from Northern California, and Lincoln subscribed to a telephone number in Day, a town in the northern half of the state. Additionally, telephone records indicated that there were nine calls between Lincoln and Mincoff on July 27, 2005, which corresponds to the dates that Mincoff discussed the cocaine sale with Munoz.

*July 29, 2005 Telephone Call*

Vega's friend Shadow contacted Munoz at 12:48 p.m. to ask, "did you still need that or not?" Munoz replied that, "they said not until Tuesday."

*August 3, 2005 Telephone Call*

The deal appeared to be on between Mincoff and Munoz as long as Munoz's supplier could bring the drugs down from Los Angeles. At 10:39 a.m., Mincoff stated, "Yeah, if they'll bring one down we'll do it."

*August 4, 2005 Telephone Call*

At 9:42 a.m., Munoz and Vega discussed whether the Engineer had "anything right now." In a 12:09 p.m. call, Munoz tells Mincoff that he will get back to him by 3:00 or 4:00 p.m. Munoz understood that the deal would take place if he obtained the cocaine. However, Munoz was not able to do so.

## II.   STANDARDS OF REVIEW

"We review de novo the district court's denial of a motion for judgment of acquittal based on insufficient evidence." *United States v. Dearing*, 504 F.3d 897, 900 (9th Cir. 2007) (citation omitted). "The evidence is sufficient to support a

conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation, emphasis, and internal quotation marks omitted).

"Where the parties dispute whether the evidence supports a proposed instruction, we review a district court's rejection of the instruction for an abuse of discretion." *United States v. Bello-Bahena*, 411 F.3d 1083, 1089 (9th Cir. 2005) (citation omitted). When there is a "question whether the district court's instructions adequately presented the defendant's theory of the case," the "district court's denial of a proposed jury instruction" is reviewed de novo. *United States v. Somsamouth*, 352 F.3d 1271, 1274 (9th Cir. 2003) (citations and internal quotation marks omitted).

"The district court's application of the STA [Speedy Trial Act] is reviewed *de novo*, and its factual findings are reviewed for clear error." *United States v. Pete*, 525 F.3d 844, 848 n.3 (9th Cir. 2008) (citation omitted).

"We review *de novo* an asserted *Brady*/*Giglio* violation." *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004) (citation omitted).

"We review a district court's denial of a motion to produce a witness' statement pursuant to the Jencks Act for abuse of discretion." *United States v. Nash*, 115 F.3d 1431, 1440 (9th Cir. 1997) (citation omitted).

"Questions of statutory interpretation are reviewed *de novo*." *United States v. Youssef*, 547 F.3d 1090, 1093 (9th Cir. 2008) (citation omitted). "We review *de novo* whether a statute is unconstitutionally vague." *United States v. Wyatt*, 408 F.3d 1257, 1260 (9th Cir. 2005) (citation omitted).

## III.  DISCUSSION

### A.  Sufficiency of Evidence of Conspiracy

**[1]** "To establish a drug conspiracy, the government must prove: 1) an agreement to accomplish an illegal objective; and 2) the intent to commit the underlying offense." *United States v. Barragan*, 263 F.3d 919, 922 (9th Cir. 2001) (citation omitted). The government "can prove the existence of a conspiracy through circumstantial evidence that defendants acted together in pursuit of a common illegal goal." *United States v. Bishop*, 1 F.3d 910, 911 (9th Cir. 1993) (citation omitted). "Express agreement is not required; rather, agreement may be inferred from conduct." *United States v. Hegwood*, 977 F.2d 492, 497 (9th Cir. 1992) (citation omitted).

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find that Mincoff entered into a conspiracy to distribute cocaine, rather than merely making or attempting to make a purchase.

### 1.  The 2004 Completed Transaction

**[2]** Mincoff and Munoz agreed that Mincoff would take the cocaine to his source and return with the money. This type of arrangement is known as "fronting." "Fronting is a sales technique in which some or all of the drugs being sold are provided before payment is required." *United States v. Ramirez-Robles* 386 F.3d 1234, 1242 n.2 (9th Cir. 2004) (internal quotation marks omitted).

**[3]** Although we have not specifically commented on the relationship between fronting and conspiracy, other circuits have credited evidence of fronting to establish a distribution conspiracy. In *United States v. Pruett*, 501 F.3d 976, 985-86 (8th Cir. 2007), *vacated on other grounds*, 128 S. Ct. 1473 (2008), the Eighth Circuit concluded that a reasonable jury could have found Pruett to be a knowing member of a con-

spiracy to distribute methamphetamine when he both purchased and sold the drug, and fronted one-half ounce of it on at least one occasion.

Similarly, the evidence in *United States v. Beasley*, 2 F.3d 1551, 1560-61 (11th Cir. 1993), *as amended*, *cert. denied*, 512 U.S. 1240 (1994), was sufficient to sustain the defendant's conspiracy conviction where the defendant's supplier testified that the defendant purchased crack cocaine from him on several occasions and that the supplier sometimes fronted cocaine to the defendant.

### 2. The 2005 Planned Transaction

**[4]** Although the 2005 transaction was not completed because Munoz was unable to secure the cocaine for Mincoff's buyer, the recorded telephone calls reflect that Mincoff and Munoz planned to incorporate fronting into their second transaction. In fact, Mincoff specifically asked Munoz to deliver the drugs directly to him to save time. In both the 2004 and 2005 transactions, the existence of a deferred payment arrangement supports the conclusion that Mincoff was engaged in a conspiracy to distribute cocaine. *See United States v. Johnson*, 437 F.3d 665, 676 (7th Cir. 2006) (noting that fronting demonstrated trust between the parties and was sufficient to establish that there was a "continuing and mutually profitable relationship to distribute drugs") (citation omitted). We are persuaded by precedent from our sister circuits that evidence of fronting may support a conviction for conspiracy to distribute a controlled substance. *See United States v. Bender*, 539 F.3d 449, 454 (7th Cir. 2008) ("[S]elling drugs on credit is especially indicative of a conspiracy because it gives the seller a stake in the buyer's successful resale of the drugs.") (citation omitted); *see also United States v. Pizano*, 421 F.3d 707, 719-20 (8th Cir. 2005) (relying on evidence of fronting over five-year period to uphold conviction for conspiracy to distribute).

### 3. The Buyer-Seller Rule

**[5]** The district court instructed the jury on Mincoff's theory that "[u]nder the controlling buy-sell law, there was no conspiracy to distribute cocaine." The jury was instructed that:

> The sale of narcotics, standing alone, does not establish a conspiracy to distribute narcotics; rather, the government must establish beyond a reasonable doubt that the buyer and seller in a narcotics transaction had an agreement to further distribute the narcotics in question.

> The sale of large quantities of narcotics, without more, is insufficient to establish an agreement between the buyer and seller to further distribute narcotics; however, the sale of large quantities of narcotics, in combination with other factors that indicate the buyer conspired with the seller to effect a further narcotics transaction, may be sufficient to establish a conspiracy to distribute narcotics.

The jury obviously did not adopt Mincoff's theory because it convicted him of one count of conspiracy to distribute cocaine.

**[6]** Viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the buyer-seller rule inapplicable to the facts of this case. In *United States v. Lennick*, 18 F.3d 814, 819 (9th Cir. 1994), the defendant sold marijuana to friends for their personal use. There was no evidence that the friends "further distributed the marijuana" or that "Lennick sold them marijuana in a sufficient quantity to support an inference that they were going to further distribute it." *Id.* (citation omitted). Here, by contrast, Munoz sold Mincoff large quantities of cocaine that could support an inference of further distribution. Also, the recorded

calls and Munoz's testimony revealed that both he and Mincoff were well aware that they were procuring the cocaine for Mincoff's buyers. Mincoff's conspiracy conviction was warranted because the evidence demonstrated an agreement to further distribute the cocaine, rather than the "mere purchase" of large quantities of drugs.

**[7]** The facts of *United States v. Thomas*, 284 F.3d 746 (7th Cir. 2002), on which Mincoff relies, are distinguishable for the same reason. *See Thomas*, 284 F.3d at 752-53 (noting the lack of an agreement between the buyer and seller). Munoz knew at all times that Mincoff was purchasing the cocaine for his customers. Munoz had a shared stake in Mincoff's illegal venture because he made $500 per kilogram of cocaine sold in 2004. Munoz was confident that he would make a similar profit on the 2005 deal. The fronting that occurred in 2004, and was to occur in 2005, demonstrated mutual trust between Munoz and Mincoff. Ultimately, if one looks at the "entire course of dealing" between Mincoff and Munoz, there is evidence that Munoz, unlike the defendant in *Thomas*, "shared with [Mincoff] a stake in the success of the retail sales to [Mincoff's] customers . . . " *Thomas*, 284 F.3d at 753.

### 4.   Agreement on Essential Terms of the Planned 2005 Transaction

"A formal agreement is not necessary [for a conspiracy]; an agreement may be inferred from the Appellants' acts pursuant to the scheme, or other circumstantial evidence." *United States v. Hopper*, 177 F.3d 824, 829 (9th Cir. 1999) (citation omitted).

Mincoff and Munoz agreed to the essential terms of the planned 2005 transaction. Mincoff initially ordered "maybe seven but six [kilograms] for sure." When the cocaine had not arrived by July 27, Mincoff's buyers grew impatient, and Mincoff reduced the order to three kilograms. Mincoff further

reduced the cocaine order to one kilogram on July 28 because his buyers were leaving town.

The changing quantities of cocaine do not necessarily indicate that there was no agreement on Mincoff's part. In the 2004 transaction, Mincoff ordered eight kilograms of cocaine for his buyer, but Munoz was only able to procure five. Mincoff accepted the reduced order, and retrieved the drugs within the hour.

Mincoff and Munoz also agreed on the price of the cocaine. Munoz sold Mincoff the cocaine for $15,500 per kilogram in 2004. The transcript of the recording indicates that Mincoff was expecting to pay about the same price per kilogram in 2005: "I just . . . assume [sic] do 'em with you if the numbers are right, because we didn't have any problem with 'em last time." Munoz also testified that he and Mincoff were set on the price of the cocaine, and that price was $15,500 per kilogram, the same price as in 2004.

Munoz confirmed his belief that there was an agreement between Mincoff and him to obtain cocaine and redistribute it to other individuals. Circumstantial evidence bolstered Munoz's belief. *See United States v. Williams*, 547 F.3d 1187, 1196-97 (9th Cir. 2008) (noting that the evidence was sufficient to establish that the defendants "acted together with a common goal") (citation omitted).

**[8]** In sum, the evidence was sufficient to establish that Mincoff was involved in a drug distribution conspiracy with Munoz and others. Evidence of the fronting arrangement, the intent to further distribute the cocaine, the shared stake in the success, and the agreement on essential terms of the 2005 planned transaction support the conspiracy conviction.

### B.  Sufficiency of Evidence of Attempt to Distribute a Controlled Substance

**[9]** "[A]n attempt conviction requires evidence that a defendant intended to violate the statute and took a substantial step

toward completing the violation." *United States v. Meek*, 366 F.3d 705, 720 (9th Cir. 2004) (citations and internal quotation marks omitted). "To constitute a substantial step, a defendant's actions must cross the line between preparation and attempt by unequivocally demonstrating that the crime will take place unless interrupted by independent circumstances." *United States v. Goetzke*, 494 F.3d 1231, 1237 (9th Cir. 2007) (citation and internal quotation marks omitted).

**[10]** Mincoff crossed the line between preparation and attempt during the 2005 planned transaction. Mincoff and Munoz discussed the details of Mincoff's order. Mincoff repeatedly asked Munoz whether they could "knock out" the deal "now." Mincoff did everything within his power to consummate the cocaine deal. His buyer, who was from Northern California, arrived in person to pick up the drugs in San Diego, and was present during some of the calls to Munoz. Munoz testified that he had no reason to believe that Mincoff did not intend to fully go through with the transaction. The only thing missing was the drugs, and Munoz asserted that finding the cocaine was all that remained to be done to complete the deal. The evidence demonstrates that Mincoff would have gone through with the narcotics sale and redistribution but for the independent circumstance that Munoz, his supplier, could not secure the drugs. Therefore, because he did all he could to ensure the deal's completion, a rational trier of fact could have found that Mincoff attempted to distribute cocaine. *See United States v. Smith*, 962 F.2d 923, 930-31 (9th Cir. 1992) (explaining that there was sufficient evidence of an attempt where the defendant "committed all the steps necessary on his part.").

Citing *United States v. Yossunthorn*, 167 F.3d 1267, 1271-73 (9th Cir. 1999), Mincoff proposes that there were too many uncertainties in the 2005 planned transaction to constitute an attempt. However, *United States v. Hernandez-Franco*, 189 F.3d 1151, 1157 (9th Cir. 1999), explains that:

> *Yossunthorn* merely held that conducting countersur-
> veillance activities to ensure the security of a meet-
> ing to make arrangements for some future drug
> purchase did not constitute a substantial step to sus-
> tain a conviction for attempted possession with
> intent to distribute heroin because too many steps
> remained for the crime to be completed.

(citation and internal quotation marks omitted). Here, as in *Hernandez-Franco*, "there was much less uncertainty," as the only task remaining was for Munoz to obtain the cocaine. *Id.* Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could conclude that Mincoff's conduct "was undertaken in accordance with a design to violate the statute." *Id.* (citation omitted).

## C. Sufficiency of Evidence of Unlawful Use of a Communication Facility

**[11]** "In order to show a violation of section 843(b), the government must establish knowing and intentional use of a communications facility, *e.g.*, a telephone, to facilitate the commission of a narcotics offense." *United States v. Davis*, 960 F.2d 820, 827 (9th Cir. 1992) (citation, alterations, and internal quotation marks omitted). "The knowledge element of § 843(b) requires the government to prove that the defendant knowingly or intentionally used the communication device in order to aid or facilitate the underlying criminal violation." *United States v. Whitmore*, 24 F.3d 32, 35 (9th Cir. 1994) (citations and footnote reference omitted). "What is essential is that the defendant knows that he or she is using the communication device to facilitate the drug transaction." *Id.*

**[12]** There was sufficient evidence to support Mincoff's convictions under § 843. The recorded calls between Mincoff and Munoz, where price, quantity, and delivery were discussed, establish that Mincoff knowingly used a telephone to

facilitate the distribution of cocaine. *See Davis*, 960 F.2d at 827 (concluding that direct and circumstantial evidence were sufficient to show that defendant used a telephone, or instructed another to use a telephone, to facilitate a drug deal).

Mincoff's reliance on *United States v. Rivera*, 775 F.2d 1559 (11th Cir. 1985), is unavailing because he went far beyond merely checking on the status of Munoz's efforts. *Cf. id.* at 1562 (noting that defendant made calls "simply to find out whether any sales had been made," not to facilitate the sales). In contrast, Mincoff urged Munoz to find a drug source for the willing buyers Mincoff had lined up. The only task remaining was to procure the cocaine.

### D. Mincoff's Requested Multiple Conspiracies Instruction

"A multiple conspiracies instruction is generally required where the indictment charges several defendants with one overall conspiracy . . . ." *United States v. Anguiano*, 873 F.2d 1314, 1317 (9th Cir. 1989). "Evidence sufficient to support a multiple conspiracies instruction is present where a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment." *United States v. Fernandez*, 388 F.3d 1199, 1247 (9th Cir. 2004) (citation, emphasis, and internal quotation marks omitted).

**[13]** The district court properly denied Mincoff's request for a multiple conspiracies jury instruction. Mincoff's theory that the presence of subagreements among himself and Munoz, Munoz and his suppliers, and himself and his buyers warranted a multiple conspiracies instruction, is unconvincing. It is irrelevant that Munoz's suppliers and Mincoff's buyers did not know each other or may not have been aware of every act committed in furtherance of the conspiracy, because "[a] single conspiracy can include subgroups or subagreements . . ." *United States v. Bauer*, 84 F.3d 1549, 1560 (9th

Cir. 1996), *as amended*. It is sufficient that the government proved that Mincoff "was involved in a broad project to distribute cocaine and that his benefit depended on the success of the operation." *United States v. Shabani*, 48 F.3d 401, 403 (9th Cir. 1995), *as amended* (citation omitted).

### E. Mincoff's Requested Attempt Instruction

Mincoff contends that the district court erred when it declined to give his requested instruction that there is no attempt to distribute simply from negotiations with a known drug dealer. He argues that the actual instruction given "opened a wider pathway to conviction to which the government was unentitled."

"In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Cherer*, 513 F.3d 1150, 1154 (9th Cir. 2008) (citation omitted). "The trial court has substantial latitude so long as its instructions fairly and adequately cover the issues presented." *Id.* (citation and alteration omitted).

**[14]** The attempt instruction was not misleading or inadequate to guide the jury's deliberation. It read:

> A substantial step towards the commission of the crime of distribution of cocaine requires more than mere preparation. Merely initiating a transaction with a known drug supplier, without more, is not sufficient. In evaluating whether a substantial step toward the commission of the crime of distribution of cocaine has been taken, you may consider the nature and scope of the negotiations between a buyer and seller, as well as all other circumstances relating to the commission of the alleged crime.

This instruction tracks the language in *Yossunthorn*, which stated:

> When key elements of the drug deal are incomplete, making an appointment with a known drug supplier, even one who has previously fronted drugs to the defendant at a fixed price, is . . . not of itself such a commitment to an intended crime as to constitute an attempt, even though it may make a later attempt possible.

167 F.3d at 1272-73 (citation and internal quotation marks omitted). The district court also provided an instruction that tracks Ninth Circuit Model Criminal Jury Instruction on attempt:[2]

> The defendant is charged in Count 2 of the superseding indictment with attempted distribution of cocaine in violation of Sections 841(a)(1) and 846 of Title 21 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt: First, the defendant intended to deliver cocaine to another person; Second, the defendant knew it was cocaine or some other prohibited drug; and Third, the defendant did something that was a substantial step toward committing the crime, with all of you agreeing as to what constituted the substantial step. Mere preparation is not a substantial step toward the commission of the crime of distribution of cocaine.

---

[2]The text of Ninth Circuit Model Criminal Instruction 5.3 (2003) reads: "The defendant is charged in the indictment with attempting to commit [ *crime charged*]. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt: First, the defendant intended to commit [*crime charged*]; and Second, the defendant did something which was a substantial step toward committing the crime, with all of you agreeing as to what constituted the substantial step. It is a crime to commit [*crime charged*]. Mere preparation is not a substantial step toward the commission of the [*crime charged*]."

Because the instructions addressing attempt tracked the language of *Yossunthorn* and the Ninth Circuit Model Criminal Instruction, they adequately informed the jury of the requirements for conviction on the charge of attempt to distribute cocaine.

## F. Constructive Amendment of the Indictment

Mincoff contends that the indictment was constructively amended because the government's charge did not match the proof offered at trial. Essentially, he argues that a conspiracy to distribute cocaine requires proof that one possessed that cocaine. Mincoff theorizes that the indictment implicitly charged possession of cocaine by charging conspiracy to distribute cocaine. Because the government did not prove that he possessed cocaine, Mincoff accuses the government of charging one thing and proving another.

"A constructive amendment involves a change, whether literal or in effect, in the terms of the indictment." *United States v. Adamson*, 291 F.3d 606, 614 (9th Cir. 2002) (citation and internal quotation marks omitted). A constructive amendment requires reversal and occurs where "(1) there is a complex of facts presented at trial distinctly different from those set forth in the charging instrument, or (2) the crime charged in the indictment was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *Id.* at 615 (citations, alterations, and internal quotation marks omitted).

The Superseding Indictment charged Mincoff with "knowingly and intentionally conspir[ing] . . . to distribute 5 kilograms and more of cocaine . . ." The proof at trial, including Munoz's testimony and the recorded telephone calls, establish that Mincoff ordered large quantities of cocaine from Munoz with the intent to further distribute the cocaine to Mincoff's buyers. Nevertheless, Mincoff contends that the government

did not prove the charges in the indictment, because there was no proof that he possessed cocaine.

Although we have not yet ruled on this precise issue, other circuits have rejected the argument that possession is a necessary element of the crime of conspiracy to distribute narcotics. *See*, *e.g.*, *United States v. Osuna-Zepeda*, 416 F.3d 838, 843 (8th Cir. 2005) ("Possession of the narcotic is not a necessary element of the crime of conspiracy to distribute.") (citations omitted); *United States v. Colon*, 268 F.3d 367, 377 (6th Cir. 2001) ("[I]t is possible to commit the distribution element of the crime without possessing the drugs themselves.") (internal quotation marks omitted); *United States v. Jackson*, 213 F.3d 1269, 1297 (10th Cir.), *vacated on other grounds*, 531 U.S. 1033 (2000) ("Although it may be unusual for a person to distribute a controlled substance without at least momentarily possessing the controlled substance, it is not impossible.") (citations omitted); *United States v. Sepulveda*, 102 F.3d 1313, 1317 (1st Cir. 1996) ("While possession is certainly helpful in proving distribution, it is technically not a necessary element.") (citations and internal quotation marks omitted); *United States v. Barrientos*, 758 F.2d 1152, 1158 (7th Cir. 1985) (same).

**[15]** We adopt the rule articulated by our sister circuits that a narcotics distribution charge may be proven without proof of possession. This conclusion is consistent with the general law of conspiracy—that the conspiracy is complete once agreement is reached and an overt act is committed by either conspirator to further the agreement. *See United States v. Bosch*, 914 F.2d 1239, 1241 (9th Cir. 1990) ("The conspiracy was complete when the conspirators had agreed to commit the offense and one of them had done an overt act in furtherance of the agreement. The accomplishment of the conspiracy's goal is immaterial . . .") (citation omitted). To hold otherwise would create a loophole allowing drug conspirators to dodge conviction by avoiding possession of the drugs that formed the very basis of the conspiracy. Because the evidence proved

the conspiracy charge in the Superseding Indictment, Mincoff's argument that the indictment was constructively amended fails.

## G.   Speedy Trial Ruling

"The Speedy Trial Act, 18 U.S.C. § 3161, sets forth those trial delays which shall be excluded in computing the time within which a defendant's trial must commence." *United States v. Aviles-Alvarez*, 868 F.2d 1108, 1111 (9th Cir. 1989). "A continuance will result in excludable delay only if the continuance is based on the district court's findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *Id.* at 1112 (citation and internal quotation marks omitted).

The district court's factual findings and conclusion that the ends of justice supported exclusion of time in this case were not clearly erroneous. Mincoff and three codefendants were indicted on June 6, 2006. On August 22, 2006, the district court made oral and written findings that this case was "unusually complex" and excluded time under the STA from August 16, 2006 to October 11, 2006. Pursuant to other factual findings, the district court also excluded time from October 11, 2006 to November 29, 2006; November 29, 2006 to March 14, 2007; March 14, 2007 to June 27, 2007; and June 27, 2007 to August 3, 2007.

**[16]** Each of the factual findings described how this case was related to five other cases pending before the district court by way of common evidence and common defendants, with a total of thirty-four individuals before the district court. Two of the four individuals originally charged in this case were also charged with a RICO conspiracy that presented "novel questions of fact and law." The findings related that as of June 29, 2007,

> the Government has produced in discovery approximately 48,000 pages of written material, 130 com-

pact disks, 4 digital video disks, 17 video tape recordings and 15 audio cassette tapes. The compact disks contain, among other things, approximately 30,000 intercepted telephone calls and approximately 31,400 pages of line sheets which correspond to those calls.

These findings complied with *Aviles-Alvarez*. The exclusions were specifically limited in time and justified with reference to the facts as of the time the delay was ordered.

### H. The Government's Obligations Under *Brady*, *Giglio*, and the Jencks Act

#### 1. Brady/Giglio

*Brady* requires the government to disclose "any evidence favorable to Defendants material to their guilt or innocence." *United States v. Chapman*, 524 F.3d 1073, 1078 (9th Cir. 2008). *Giglio* requires that the government disclose "any promises, inducements, or threats made to witnesses to gain cooperation in the investigation or prosecution." *Id.*

"The three elements of a *Brady* violation are: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Williams*, 547 F.3d 1187, 1202 (9th Cir. 2009) (citation, alteration, and internal quotation marks omitted). "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Jackson v. Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008) (citation and internal quotation marks omitted).

[17] The district court properly denied Mincoff's motions for *Brady*/*Giglio* material. Mincoff requested any untruthful

or incomplete information or testimony in addition to the notes taken during FBI interviews of Munoz. However, Mincoff concedes that the government informed him of Munoz's contradictory statement regarding the reduction of the 2004 cocaine order from eight to five kilograms. Aside from this contradiction, Mincoff has not identified any potentially exculpatory evidence that was not disclosed to him. Mincoff's "mere speculation about materials in the government's files" did not require the district court to make those materials available, or mandate an *in camera* inspection. *United States v. Michaels*, 796 F.2d 1112, 1116 (9th Cir. 1986).

### 2. *Jencks Act*

"The Jencks Act[3] mandates that after a witness called by the United States testifies on direct, the United States must, on motion by the defendant, produce any statement of the witness in the possession of the United States that relates to the subject matter testified to by the witness." *United States v. Riley*, 189 F.3d 802, 805 (9th Cir. 1999) (citation omitted). The term "statement" means "a written statement made by said [government] witness and signed or otherwise adopted or approved by him," or "a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement." *United States v. Ogbuehi*, 18 F.3d 807, 810 n.1 (9th Cir. 1994) (citation and alteration omitted).

[18] The district court did not abuse its discretion when it found that the interview notes were not Jencks Act material. Although notes were taken by FBI agents during the interviews with Munoz, nothing in the record suggests that the notes amount to substantially verbatim recitals of Munoz's oral statements. Further, the agents never read any of these notes back to Munoz and there is nothing to indicate that

---

[3]18 U.S.C. § 3500.

Munoz "signed or otherwise adopted or approved" the notes as his own statements. Thus, the notes cannot be considered substantially verbatim recitals of Munoz's oral statements that were adopted by him. "A government agent's rough notes will not be Jencks Act statements when they are not complete, are truncated in nature, or have become an unsiftable mix of witness testimony, investigator's selections, interpretations, and interpolations." *United States v. Simtob*, 901 F.2d 799, 809 (9th Cir. 1990) (citation and internal quotation marks omitted). The district court correctly determined that the interview notes were not subject to production under the Jencks Act.

## I.   The Sentence Enhancement

### 1.   Felony Drug Offense

Mincoff contends that the district court erred by doubling the minimum mandatory sentence on Counts 1 and 2 from ten to twenty years and on Counts 3 and 4 from four to eight years. The double penalties apply only if Mincoff's 1990 conviction for possession of a listed chemical with intent to manufacture methamphetamine is a "felony drug offense."

"Federal law imposes a mandatory minimum sentence for certain crimes, but only if the defendant has a felony drug prior. In order to render defendant eligible for the mandatory minimum, the government must allege the prior conviction in an information pursuant to 21 U.S.C. § 851." *United States v. Severino*, 316 F.3d 939, 941 (9th Cir. 2003) (en banc). "The term felony drug offense means an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802(44) (internal quotation marks omitted).[4] Ephe-

---

[4]The United States Supreme Court recently determined that § 802(44) provides the exclusive definition of a "felony drug offense." *Burgess v. United States*, 128 S.Ct. 1572, 1577 (2008).

drine can be used as a precursor chemical to manufacture methamphetamine. *See United States v. Lo*, 447 F.3d 1212, 1224 n.6 (9th Cir. 2006).

Mincoff's prior offense is a felony drug offense. On October 18, 1990, Mincoff was found guilty of possession of a listed chemical (ephedrine) with the intent to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(d)(1) and 802(34)(C). Mincoff was sentenced to 120 months' imprisonment, but his sentence was reduced to 57 months.

**[19]** The government filed an information and notice to seek enhanced penalties. As a result, Mincoff's expert filed a declaration stating that ephedrine is not a narcotic drug, marihuana, anabolic steroid, or depressant or stimulant substance. However, methamphetamine falls within the definition of a stimulant substance as defined by 21 U.S.C. § 802(9)(B).[5] *See United States v. Ward*, 63 F. Supp. 2d 1203, 1207 n.4 (C.D. Cal. 1999) (citation and internal quotation marks omitted); *see also Metabolife International, Inc. v. Wornick*, 264 F.3d 832, 849 (9th Cir. 2001) (recognizing ephedrine as a stimulant). Therefore, Mincoff's possession of ephedrine was conduct relating to the stimulant substance of methamphetamine, resulting in a conviction qualifying as a felony drug offense. *See United States v. Hollis*, 490 F.3d 1149, 1157 (9th Cir. 2007) ("To determine whether a prior conviction qualifies as a drug trafficking offense, we look only to the fact of conviction and the statutory definition of the prior offense.") (citation omitted).

---

[5]"The term depressant or stimulant substance means . . . (B) a drug which contains any quantity of (i) amphetamine or any of its optical isomers; (ii) any salt of amphetamine or any salt of an optical isomer of amphetamine; or (iii) any substance which the Attorney General, after investigation, has found to be, and by regulation designated as, habit forming because of its stimulant effect on the central nervous system . . ." 21 U.S.C. § 802(9)(B) (internal quotation marks omitted).

*2.  Constitutionality of 21 U.S.C. § 841(b)*

Mincoff contends that the term "felony drug offense" as used in 21 U.S.C. § 841(b) is vague as applied to his prior conviction of possession of ephedrine with intent to manufacture methamphetamine.

"A law is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 554 (9th Cir. 2004), *as amended* (citations omitted).

[20] Section 841 is constitutional as applied to Mincoff. In *United States v. Van Winrow*, 951 F.2d 1069, 1072 (9th Cir. 1991), we rejected a claim that the definition of a "felony drug offense" was unconstitutionally vague as applied to a defendant with prior felony convictions for cocaine possession. Mincoff attempts to distinguish his case from *Van Winrow* on the basis that the phrase "conduct relating to a felony drug offense" is vague as applied to his prior conviction of possession of ephedrine with intent to manufacture methamphetamine, as ephedrine itself is not a stimulant. This argument is unconvincing because a reasonable person would know that possession of ephedrine with intent to use it in manufacturing methamphetamine is conduct relating to a felony drug offense of methamphetamine production.

Contrary to Mincoff's view, the rule of lenity does not apply because the statute is not ambiguous. Accordingly, there is no need to construe § 841 in Mincoff's favor. *See United States v. Hoyt*, 879 F.2d 505, 511-12 (9th Cir. 1989), *as amended*.

## IV.  CONCLUSION

We affirm Mincoff's conviction and sentence. The evidence was sufficient to sustain the convictions for conspiracy

to distribute cocaine, attempt to distribute a controlled substance, and use of a communication facility. There was no abuse of discretion in declining to give a multiple conspiracies instruction or an instruction stating that negotiating with a known drug dealer is not sufficient proof of an attempt to distribute. There was no Speedy Trial Act violation, no *Brady/Giglio* violation, and no Jencks Act violation. The penalty enhancement was not vague as applied.

**AFFIRMED.**