**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

CHRISTOPHER JAMES,
*Defendant-Appellee.*

No. 13-10543

D.C. No.
3:11-cr-08206-NVW-1

OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
August 11, 2015—San Francisco, California

Filed January 14, 2016

Before: Alex Kozinski and Richard C. Tallman, Circuit
Judges and Lawrence L. Piersol,* Senior District Judge.

Opinion by Judge Tallman;
Dissent by Judge Kozinski

---

\* The Honorable Lawrence L. Piersol, Senior United States District
Judge for the District of South Dakota, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel reversed the district court's decision granting a motion for acquittal after a jury rendered a verdict against the defendant on two counts of sexual abuse of a severely disabled woman under 18 U.S.C. § 2242(2)(B), vacated the judgment of acquittal, and remanded for reinstatement of the jury verdict.

The panel held that "physically incapable" under § 2242(2)(B)—which punishes a sexual act with a person physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act— should be defined broadly and not confused with the more narrow "physically helpless" standard employed by the district court. The panel held that the government proffered sufficient evidence—when viewed in the light most favorable to it—to allow a rational juror to conclude beyond a reasonable doubt that the woman was physically incapable of declining participation in, or communicating her unwillingness to engage in, a sexual act with the defendant. The panel held that—to the extent a defendant raises a factual dispute regarding consent as a defense under § 2242(2)(B)—the jury is the appropriate fact-finder to weigh the question when evaluating the victim's physical incapacity to decline participation or communicate her unwillingness to engage in the alleged sexual abuse.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting, Judge Kozinski wrote that, as the district court recognized, the government simply did not introduce the type of evidence that would allow "*any* rational trier of fact" to conclude that the woman's physical limitations rendered her incapable of declining participation or communicating unwillingness.

**COUNSEL**

Dimitra H. Sampson (argued), Assistant United States Attorney; John S. Leonardo, United States Attorney; Mark S. Kokanovich, Deputy Appellate Chief, Phoenix, Arizona, for Plaintiff-Appellant.

Keith J. Hilzendeger (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender, Phoenix, Arizona, for Defendant-Appellee.

**OPINION**

TALLMAN, Circuit Judge:

Federal law lacks a generic statute addressing non-consensual rape, as every state has. Instead, 18 U.S.C. § 2241 prohibits aggravated forcible sexual assault. 18 U.S.C. § 2242(2) covers the less frequent scenario where an assailant sexually assaults a victim who is (A) mentally incapable of understanding what is happening, or (B) physically incapable of resisting the assault. Under § 2242(2)(A), sexually assaulting a person whose mental capacity is such that one cannot form the necessary consent in many ways mirrors state statutory rape laws. The other

subsection, § 2242(2)(B), however, covers the even more infrequent scenario where the victim who is sexually assaulted may have mental capacity to consent but is incapable of communicating a refusal of unwanted intercourse. We review the latter in greater depth today on a record of heart-wrenching facts.

The district court granted a motion for acquittal after the jury rendered a guilty verdict against Christopher James on two counts of sexual abuse of a severely disabled woman under 18 U.S.C. § 2242(2)(B). The court found insufficient evidence that the victim was "physically incapable" of resisting or declining to participate in the sexual assault by James. We hold that the district court erred in granting that acquittal, although we acknowledge that determining what constitutes physical incapacity under § 2242(2)(B) is a difficult issue of first impression in our circuit. Applying the familiar standard under *Jackson v. Virginia*, 443 U.S. 307, 320 (1979), we hold, contrary to the district court's decision, that there was sufficient evidence to support the jury's determination by proof beyond a reasonable doubt that James violated the statute under which he was found guilty.

# I

T.C.[1] is severely disabled by cerebral palsy. Although T.C. was twenty-eight years old at the time of the sexual assault, she cannot care for herself and needs assistance from others with all of the major activities of daily living,

---

[1] In order to protect the victim's privacy, we refer to her solely by her initials throughout this opinion. We summarize the facts in the light most favorable to the prosecution in support of the jury's verdict. *See United States v. Dearing*, 504 F.3d 897, 900 (9th Cir. 2007).

including eating, grooming, and using the bathroom. She cannot walk without assistance. She must be lifted in and out of her wheelchair, into which she is fastened with a seatbelt in order to keep her from falling out when her limbs spasm uncontrollably. When T.C. is in the wheelchair, she can only use her feet to move around. When not in the wheelchair, she "can scoot herself kind of Army style on the floor, or she sits with her legs outward and she'll hop." She has no use of her hands and is incapable of lifting heavy objects.

It is difficult even for those who know T.C. to communicate with her or to understand her attempts at speech. T.C.'s tongue is enlarged and her voice box is thicker than normal, thus making her largely non-verbal. She communicates primarily through nodding her head yes or no in response to questions and grunting. Her full time caretaker of eight and one-half years testified that her responses are frequently inappropriate or nonsensical to the questions or situation. Her uncle testified that T.C. sometimes "gets mad" and "kind of like growls and give[s] you the mean look" if he changes a channel away from a program she prefers watching on television. T.C.'s caretaker testified she "kn[ew] about" an instance where T.C. bit a person she did not like, and that T.C. can cry and express anger. When T.C. finishes using the toilet, she will moan or grunt to indicate she is done. These examples are reflective of the extent of T.C.'s communicability.

On August 3, 2011, a family member caught James having sex with T.C. on the porch of her grandparents' home, covered with only a blanket. The incident occurred inside the boundaries of the Fort Apache Reservation within Indian Country. Because James was adopted by the victim's grandparents—who also raised T.C. following the death of

her mother during childbirth—T.C. is legally James' niece. The aunt who discovered James lying on top of T.C. called for an ambulance, which rushed T.C. to the nearest clinic for a medical examination. A sexual assault nurse examiner conducted a vaginal examination and observed that T.C. had torn tissue and was bleeding from a laceration. The nurse testified that T.C. was unresponsive to her efforts at the clinic to obtain a medical or event history.

James admitted to investigators that he had sex with T.C. During interviews with an agent from the Bureau of Indian Affairs ("BIA"), James confessed to removing T.C. from her wheelchair and lifting her onto a bed, after which he took off her pants and underpants, pulled down his pants, and penetrated her vaginally with his digit and penis. James also said he had been drinking, he was "ashamed," and it was not the victim's fault. In a written statement—introduced at trial—James wrote: "I'm ashamed and confusted [sic]. I don't know what made me do what I did. . . . I will not forgive me [sic] but I do ask God for forgiveness. [T.C.] is not to bleame [sic] either. She was incent [sic] of all things." When a BIA agent questioned James about the statement, James responded: "It was intercourse, but it wasn't like sex, you know? . . . [W]ith her, she's just laying there but, I mean, you are inside her and you are moving up and down." James also informed the BIA agent that T.C. cannot talk, only "ma[ke] noises."

Because the sexual assault took place on the Fort Apache Indian Reservation, James could be indicted only by the federal government since the state of Arizona has no jurisdiction there. *See United States v. Mitchell*, 502 F.3d 931, 946 (9th Cir. 2007) (noting that enacted statutes have given the federal government limited jurisdiction over certain

major crimes committed on Native American land); *cf.* 18 U.S.C. § 1162 (noting Arizona is *not* one of the six enumerated states that have "jurisdiction over offenses committed by or against Indians in the areas of Indian country"). On November 1, 2011, a federal grand jury returned an indictment charging James with two counts of sexual abuse in violation of 18 U.S.C. § 2242(2)(B). For reasons unknown, the Government did not charge James in the indictment under § 2242(2)(A), nor did it offer an expert at trial to establish her cognitive impairments, relying instead on lay testimony from family members, caregivers, the nurse, and the BIA agent.

A three-day jury trial began on July 30, 2013. The investigating BIA agent testified that he was unable to ask T.C. about the event because he could not communicate with her, but he videotaped his contact with her and that was shown to the jury during the trial.[2] The jury returned a guilty verdict on both counts of sexual abuse. Though James moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a) both at the close of the Government's case and again at the close of trial, the district court reserved its ruling on both occasions to await the jury's verdict. The jury

---

[2] The Government submitted two videos that were admitted into evidence at trial: (1) clips of T.C. at her school taken near the time of the incident with James; and (2) the attempted "interview" between the BIA agent and T.C. filmed after the incident. Both of these videos, particularly the latter, demonstrate examples of T.C.'s extreme physical limitations and her inability to provide a narrative as to what happened. This was powerful corroborative evidence for the jury's consideration of the testimony offered by those who knew her best as to whether she was physically incapable of declining participation in, or communicating her unwillingness to engage in, sexual acts with James. She was not called as a witness at trial for the same reasons.

convicted. After post-trial briefing and oral argument, the district court granted James' Rule 29 motion and entered its Judgment of Acquittal on September 26, 2013. The Government timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

## II

We review *de novo* a district court's ruling on a motion for acquittal. *United States v. Sanchez*, 639 F.3d 1201, 1203 (9th Cir. 2011). We review evidence presented against the defendant in the light most favorable to the Government to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009) (internal quotation omitted).

## III

Congress promulgated 18 U.S.C. § 2242 in 1986 as part of its effort to "modernize and reform Federal rape statutes." H. Rep. No. 99-594, at 6 (1986). It states in relevant part:

> Whoever, in the special maritime and territorial jurisdiction of the United States[3] . . . knowingly—
>
> (1) causes another person to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or

---

[3] The "special maritime and territorial jurisdiction of the United States" includes Indian Country. *United States v. Begay*, 42 F.3d 486, 498 (9th Cir. 1994).

placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping); or

(2) engages in a sexual act with another person *if that other person is*—

(A) incapable of appraising the nature of the conduct; or

(B) *physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act*;

or attempts to do so, shall be fined under this title and imprisoned for any term of years or for life.

18 U.S.C. § 2242 (emphasis added).[4]          Because the Government indicted James under only subsection (2)(B)—physical incapacity—rather than subsection (2)(A)—mental incapacity—the jury could convict James only if it deemed T.C. physically incapable of resisting or communicating her lack of consent.

This case turns on the breadth of the "physically incapable" standard in § 2242(2)(B) for punishing a sexual act with an individual with the physical incapacity to decline participation in or communicate unwillingness to engage in

---

[4] 18 U.S.C. § 2241 proscribes aggravated sexual abuse, which includes causing another person to engage in a sexual act (a) by force or threat, (b) by rendering the victim unconscious (e.g., by a drug), or (c) when the victim is a child.

the act.**5**   The statutory definitions provided in 18 U.S.C. § 2246 do not define "physically incapable," nor did Congress provide context for this term in the legislative history.  While no federal court has definitively addressed the issue, we hold that "physically incapable" under § 2242(2)(B) should be defined broadly and not confused with the more narrow "physically helpless" standard employed by the district court.  As so interpreted, we think the Government provided sufficient evidence to permit the question to proceed to the jury.  The resulting guilty verdict meets the standard of *Jackson*. *See Jackson*, 443 U.S. at 320.

Due to the lack of congressional direction and germane federal precedent, the district court opted to draw a parallel between the federal statute's "physically incapable" language and the "physically helpless" language employed by some states in their rape schemes—holding essentially that T.C. would need to be totally physically helpless in order for the jury to convict James under § 2242(2)(B). *See, e.g.*, Conn. Gen. Stat. § 53a-71(a)(3); N.Y. Penal Law § 130.35(2).  The district court may have relied on this parallel because some states' definitions of "physically helpless" similarly discuss an inability to communicate.  For example, both Oregon and New York define the term "physically helpless" as "a person [who] is unconscious or for any other reason is physically unable to communicate unwillingness to [engage in a sexual]

---

**5** The dissent appears to suggest we should apply the rule of lenity in interpreting this statute.  *See* Dissent at 20.  However neither we or the dissent find the statute ambiguous.  *Id*. ("What this means is perfectly clear.").  Therefore, the rule of lenity does not apply.  *See United States v. Shabani*, 513 U.S. 10, 17 (1994) ("The rule of lenity, however, applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute.").  The question is whether the evidence was sufficient to convict James under 18 U.S.C. § 2242(2)(B).

act."  Or. Rev. Stat. § 163.305; N.Y. Penal Law § 130.00(7); *see also* Tenn. Code § 39-13-501(5).

But relying on state law as the district court did is problematic.  First, the Supreme Court has held that "in the absence of a plain indication of an intent to incorporate diverse state laws into a federal criminal statute, the meaning of the federal statute should not be dependent on state law." *United States v. Turley*, 352 U.S. 407, 411 (1957); *see also Taylor v. United States*, 495 U.S. 575, 591 (1990).  We find this guidance particularly applicable here.  State law statutory schemes are very different from federal law because state law punishes the broad category of non-consensual rape—but federal law has no such counterpart.  Noticeably absent from 18 U.S.C. § 2242 is a provision punishing non-consensual sexual intercourse.  The scope of conduct punished by federal law is therefore narrower than the scope of conduct punished by state law.  *See United States v. Cabrera-Gutierrez*, 756 F.3d 1125, 1134 (9th Cir. 2014) ("Nonconsensual intercourse with a mentally and physically capable individual not involving a threat or the use of fear might violate Or. Rev. Stat. § 163.425, but it would not violate 18 U.S.C. § 2242.").

Second, the district court followed the line of state case law that construes the term "physically helpless" very narrowly.  *See State v. Fourtin*, 52 A.3d 674 (2012); *People v. Huurre*, 603 N.Y.S.2d 179 (N.Y. App. Div. 1993). Although both cases involved victims who suffer from cerebral palsy as T.C. does, the district court ignored the differences between the legal terms "physically incapable" and "physically helpless."  In *Fourtin*, a 4–3 decision, the majority held a woman who could not walk or talk nonetheless failed to meet the physically helpless standard because she could nonverbally communicate her

unwillingness to engage in the sexual act by biting, kicking, and screaming. 52 A.3d at 689. Rather than apply a common sense interpretation of the term, *Fourtin* explained that "'physically helpless' has a particular statutory meaning that requires *more than* a showing that a victim is totally physically incapacitated." *Id.* (emphasis added); *see also id.* at 682 ("[N]o one would dispute that the victim is physically helpless in the ordinary sense of that term."). In *Huurre*, the state appellate court held that the victim was able to nonverbally communicate her unwillingness to do something by making guttural noises. 603 N.Y.S.2d at 306–07. Although the state had not sustained its burden in presenting evidence sufficient to demonstrate the victim was physically helpless, *Huurre* noted that the state had sustained its burden of showing an inability to consent "by reason of a mental defect." *Id.* at 310.[6]

---

[6] Critically, states like Connecticut and New York can afford to be narrow in their interpretation of "physically helpless" because they have other statutes that address conduct where a physically restrained or disabled victim verbally or non-verbally indicates lack of consent. *See, e.g.*, *People v. Morales*, 528 N.Y.S.2d 286, 286–87 (N.Y. Sup. Ct. 1988) (dismissing one count because the victim, who "suffers from muscular dystrophy rendering her paralyzed from the neck down and wheelchair bound," was not physically helpless, but sustaining indictment for forcible rape); *State v. Hufford*, 533 A.2d 866, 869–72, 873–74 (Conn. 1987) (setting aside guilty verdict for sexual contact with a woman restrained on a stretcher due to insufficient evidence she was "physically helpless" and of use of force to compel the sexual contact, but remanding for new trial to determine guilt under non-consensual sexual assault statute); *see also State v. Bucknell*, 183 P.3d 1078, 1081–82 (Wash. Ct. App. 2008) (reversing rape conviction because victim, who suffered from ALS and "was bedridden and unable to move from her chest down," was not physically helpless, but remanding for entry of judgment on a lesser charge of non-consensual sexual intercourse).

However, the term "physically helpless" has various interpretations in other states. *See, e.g.*, *Dabney v. State*, 930 S.W.2d 360 (Ark. 1996) (rejected by the majority in *Fourtin*). *Dabney* found evidence sufficient to find the victim physically helpless where she was "blind, mentally impaired, partially handicapped, and unable to speak," and "could only grunt, raise her hand, and shake her head from side to side." *Id.* at 361–62. "Granted, the victim was not completely physically incapacitated, but this is not what the statute requires; it only requires physical helplessness, not total incapacity." *Id.* at 362. As another example, Iowa punishes sex with an individual who is "mentally incapacitated, physically incapacitated, or physically helpless." Iowa Code § 709.4(d). The state defines these terms separately: "Physically helpless" means a person who "is unable to communicate an unwillingness to act because the person is unconscious, asleep, or is otherwise physically limited," and "[p]hysically incapacitated" means a person who "has a bodily impairment or handicap that substantially limits the person's ability to resist or flee." *Id.* § 709.1A. These statutes demonstrate that the concept of being "physically helpless" need not be as narrow as defined by Connecticut or New York and that "physically incapable" is a separate, broader standard.

Nothing compels us to adopt Connecticut and New York's narrow formulation of "physically helpless" over the broader approach taken by other states. The federal statute itself does not use the term "physically helpless" and the district court erred in defining "physically incapable" so narrowly. "Physically helpless" and "physically incapable" are two separate standards. "Physically helpless" suggests a lack of physical ability to do anything while "physically incapable" is a term that is more susceptible to application to

various factual situations that can come before a jury. A victim could have a physical incapacity to decline participation or be incapable of communicating unwillingness to engage in a sexual act and still not be physically helpless.

We find our support in differentiating the broader "physically incapable" standard from the more narrow "physically helpless" standard relied upon by the district court when we look to federal applications of § 2242(2)(B). For example, we have held in the context of sentencing that a defendant had committed an act in violation of § 2242 where the victim "repeatedly gained and lost consciousness" and "was unconscious or nearly so" when the defendant engaged in intercourse with her. *United States v. Morgan*, 164 F.3d 1235, 1237–38 (9th Cir. 1999). The Eighth Circuit has similarly held that sufficient evidence supported finding the victim physically incapable where "the lingering effects of the marijuana may have hindered her ability to object straightaway to the abuse," even though the victim was conscious at the time of the sexual assault. *United States v. Carter*, 410 F.3d 1017, 1028 (8th Cir. 2005); *see also United States v. Barrett*, 937 F.2d 1346, 1348 (8th Cir. 1991) (upholding conviction where the victim, though not fully awake until penetration, "vaguely remember[ed] someone pulling off her jeans and underwear").

These federal cases support our conclusion by indicating that a defendant may be convicted under § 2242(2)(B) where the victim had some awareness of the situation and—while not completely physically helpless—was physically

hampered due to sleep, intoxication, or drug use and thereby rendered physically incapable.[7]

Most compellingly, "whether a victim is physically helpless at any given moment is largely a question of fact for the jury to decide." *Fourtin*, 52 A.3d at 695 (Norcott, Eveleigh, & Harper, JJ., dissenting) (quoting *State v. Stevens*, 53 P.3d 356, 361 (Mont. 2002)); *see also State v. Tapia*, 751 N.W.2d 405, 407 (Iowa Ct. App. 2008) (same); *State v. Rush*, 650 A.2d 373, 374 (N.J. Super. Ct. App. Div. 1994) ("It is thus for the jury and not the judge to determine whether, as a matter of fact, a victim's condition meets the physically helpless standard."). The district court wisely deferred making a final decision until after the jury had spoken. It erred on this record by not abiding by its verdict.

After surveying the dearth of case law, we find the cases more persuasive which punish conduct under the broader "physically incapable" standard rather than the narrower "physically helpless" standard because it will allow more cases to be submitted to the good judgment of a jury. A jury could properly convict under § 2242(2)(B) for sexual acts committed against a victim who cannot verbally articulate her lack of consent—"physically incapable of communicating unwillingness"—as well as a victim who cannot physically resist the sexual act—"physically incapable of declining

---

[7] In contrast to our situation involving a developmentally disabled woman, the law is well established that a sexual act with one who is physically incapable due to sleep, intoxication, or drug use is punishable under § 2242(2)(B). *See United States v. Fasthorse*, 639 F.3d 1182, 1184 (9th Cir. 2011) (citing *United States v. Wilcox*, 487 F.3d 1163, 1169 (8th Cir. 2007)) (affirming conviction even where the victim woke up while the sexual act was ongoing); *Carter*, 410 F.3d at 1027–28. *Contra United States v. Peters*, 277 F.3d 963, 967 (7th Cir. 2002).

participation." We hold that the district court erred by, in essence, requiring the Government to prove T.C. was physically helpless in order to allow the jury's verdict to stand.

## IV

Now that we have settled the proper legal standard, applying the facts of this case is straightforward. We hold that the Government proffered sufficient evidence—when viewed in the light most favorable to it—to allow a rational juror to conclude beyond a reasonable doubt that T.C. was physically incapable of declining participation in, or communicating her unwillingness to engage in, a sexual act with James. *See Jackson*, 443 U.S. at 320.

The Government presented evidence that witnesses— even those who knew her well—could not always understand T.C. *Cf. Fourtin*, 52 A.3d at 680 (reasoning that "all the . . . witnesses testified that, sometimes with the aid of a communication board and at other times, with appropriate gestures, the [victim] was able to make herself understood." (alterations in original)). Although James was T.C.'s uncle by adoption, he had never resided with her, and the evidence demonstrated they never spent any appreciable time together before James sexually assaulted her. Nothing indicates he knew her well enough to understand her or could otherwise understand her attempts at communication.

Furthermore, while T.C. had some minimal means of communicating, the evidence demonstrated that she had difficulty communicating even with her longtime caregivers, close family members, the emergency room nurse, and investigators. During the physical examination after the

attack, T.C. could not communicate with the treating nurse—even through yes or no questions—nor did she seem to understand the nurse's inquiries or directives. James himself admitted that she was like a limp doll who "just lay[] there" during his assault. Thus, the facts presented at trial are sufficient to permit a juror to find that T.C.'s cerebral palsy was sufficiently severe that it rendered her incapable of being understood by others, and thereby incapable of communicating to James her unwillingness to participate in the sexual act.

The evidence also suffices to show that T.C. was physically incapable of declining participation in a sexual act with James. T.C. does not have use of her arms, cannot lift heavy objects, and would not be capable of pushing someone off who was lying on top of her. She is unable to feed or groom herself. She cannot walk nor get into or out of her wheelchair without assistance. James had to physically lift her from the wheelchair to the bed, and then he had to disrobe the victim before penetration. The facts presented at trial would permit a rational juror to find that T.C.'s cerebral palsy rendered her physically incapable of declining participation in this unwanted sexual act.[8]

---

[8] The dissent highlights evidence that could support an acquittal. Dissent at 22–25. While that evidence might support a conclusion that T.C. was capable of communicating her unwillingness to participate in the sexual act, the jury heard this evidence and did not credit it. We must presume "that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)). "[A] court of appeals may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." *Id.* The evidence is sufficient under *Jackson* to support the jury's conclusion.

**V**

We emphasize that our holding does not preclude someone suffering from a physical disability from ever having consensual sexual intercourse. Someone may suffer from a physical disability and retain sufficient mental functional capacity to consent. It is one thing to impose *per se* legal violations with respect to minors and those who cannot comprehend the nature of the act under § 2242(2)(A); it is quite another to say the law is designed in this manner for individuals who suffer solely from a physical disability.

The legislative history of § 2242(2) is clear that "[*l*]*ack* of consent by the victim is not an element of the offense, and the prosecution need not introduce evidence of lack of consent or of victim resistance." H. Rep. No. 99-594, at 16 (emphasis added). This makes sense, as it would be very difficult to prove a sleeping or intoxicated person—who could not provide any verbal or non-verbal cues—did not consent to the sexual act. But we do not think this means that in the case of a severe physical disability the jury cannot consider the *presence* of consent when determining physical incapacity.

We hold that—to the extent a defendant raises a factual dispute regarding consent as a defense under § 2242(2)(B)—the jury is the appropriate fact-finder to weigh the question when evaluating the victim's physical incapacity to decline participation or communicate her unwillingness to engage in the alleged sexual abuse. *See, e.g.*, *United States v. Fasthorse*, 639 F.3d 1182, 1185 (9th Cir. 2011) ("Although Fasthorse testified that the victim 'wasn't asleep' and consented to the sexual act, the jury rejected his version of events."). Here, James never raised consent as a defense and, in fact, conceded "it wasn't like sex" because "she's just

laying there [while] you are inside her and you are moving up and down." The district court erred by taking the question out of the jury's domain after it had rendered a guilty verdict against James, and we now vacate that ruling and remand to reinstate the verdict.

## VI

The law in its majesty protects from assault those who are too weak and feeble to protect themselves. No society worthy of being called civilized may do any less. We reverse, vacate the judgment of acquittal, order reinstatement of the jury verdict, and direct the district court to proceed to sentencing.

**REVERSED, VACATED, and REMANDED with instructions.**

---

KOZINSKI, Circuit Judge, dissenting:

I am puzzled and confused by Part III of the opinion. My colleagues work hard to prove that the district court read 18 U.S.C. § 2242(2)(B) too narrowly, but I'm not sure how the majority's reading is any different from that of the district court—or mine, for that matter. The whole enterprise seems misguided because the statute is clear and thus not reasonably susceptible to conflicting interpretations.

Here's what the statute says:

> Whoever . . . knowingly . . . engages in a
> sexual act with another person if that other

> person is . . . physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act . . . shall be fined under this title and imprisoned for any term of years or for life.

18 U.S.C. § 2242. What this means is perfectly clear: The government must prove that the alleged victim had a physical impairment and that this impairment made it impossible for her to say no to ("communicat[e] unwillingness to engage in") or otherwise indicate nonconsent to ("declin[e] participation in") sexual acts. There must be enough evidence for the jury to find beyond a reasonable doubt that the victim could not indicate, by word or deed, her lack of assent to a proposed sexual contact. Insofar as the majority tries to squeeze any more meaning out of these words—such as the possibility that the government could prove a violation by showing the victim could not actually fight off her assailant, *see* maj. at 10, 17—I must respectfully disagree. The statute is simply not susceptible to any such interpretation.

I also disagree with the methodology employed by the majority in seeking to pump up the statute beyond its ordinary meaning. The majority purports to find the statute crystal clear, maj. at 10 n.5, but then decides it must pick between broader and narrower interpretations of the statutory language. It opts for the broader one because "it will allow more cases to be submitted to the good judgment of a jury." *Id.* at 15. This rule of acerbity, *i.e.*, the rule of lenity stood on its head, is not how the criminal law is supposed to work. People must have fair notice of what is legal and what is illegal, which is why we apply the rule of lenity when confronted with an ambiguous criminal statute. *See Liparota*

v. *United States*, 471 U.S. 419, 427 (1985).  The function of the jury is to find facts and determine guilt by applying known legal standards, not to make up the law as it goes along.  The majority's "let the jury decide what's illegal" approach is unwise and, most likely, unconstitutional.  I emphatically disapprove of it.

The majority finds yet another reason for giving section 2242(2)(B) a capacious interpretation:  According to the majority, we must read section 2242(2)(B) more broadly than analogous state laws because "state law punishes the broad category of non-consensual rape—but federal law has no such counterpart."  Maj. at 11.  This is a legislative choice Congress was free to make; it gives us no license to stretch other provisions of federal law beyond their natural meaning.  The question "is not what Congress would have wanted but what Congress enacted."  *Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607, 618 (1992) (internal quotation marks omitted).  Our task is to construe the language as written, not to fill in what we perceive to be gaps in the statute.

In any event, all of these interpretive calisthenics are beside the point.  As I said at the outset, the statute speaks for itself:  A jury can convict only if it has proof that the victim could not physically express her lack of consent to the defendant's sexual advances.  Because the government chose to prosecute James under subsection (2)(B) (dealing with physical incapacity) rather than subsection (2)(A) (dealing with mental incapacity), we must assume that T.C. was capable of understanding and consenting to sexual intercourse with James.  The only question is whether she was able to communicate lack of consent if she chose not to participate.

It's quite clear that the district judge understood and applied this standard. I can do no better than to quote the district judge's own review of the evidence:

> In her opening statement, the government's counsel said, "[The victim] communicates primarily nonverbally with gestures and sounds. *She can say yes or no.*" The government's witnesses included Special [Agent] Adrian Jim, Patricia Shands, Mark Quay, and Jodie Quay.
>
> Special Agent Adrian Jim testified that when he first met with the victim, she was crying and "[i]t didn't seem like she wanted to talk to us." He testified that he interviewed the victim on a second visit, and the video recording of the second interview was played for the jury. *The video showed the victim nodding her head in agreement and shaking her head for disagreement. Special Agent Jim testified that during the second interview the victim responded to his questions by nodding her head for yes and shaking her head for no.*
>
> Patricia Shands, the victim's direct caregiver, testified that part of the victim's school program involv[ed] practicing language skills, such as "sounding out our ABCs and her vowels," working on the alphabet, and using flash cards with pictures to practice the sounds of letters. Ms. Shands testified that when the victim gets out of her wheelchair, she chooses where she wants to

sit.  Ms. Shands also testified that the victim requires assistance to use the toilet, but "she'll moan when she's done" so that a caregiver can help her get back to her wheelchair.  Ms. Shands testified that the victim can talk, but sometimes she has difficulty understanding the victim, and it is easier for the victim to show you something than to tell you.  She also testified that the victim has many friends at school, and *she can express anger and dislike for someone*.  Ms. Shands testified that *the victim communicates by nodding or shaking her head and making grunting sounds.*  She further testified that the victim can communicate her needs and desires, such as when she needs to go to the bathroom, when she is finished using the toilet, when she wants to go play on the computer, when she wants to play games, when she wants to do something, and *when she does not want to do something.*

Mark Quay, the victim's uncle, testified that the victim understands both English and Apache and *responds to questions by nodding her head for yes and shaking her head for no.* He testified that she does not talk much, but she can talk.  Mr. Quay testified that sometimes she expresses that she loves him by hugging him.  He said that when he comes to her house, she always points at him and says "Mark" or "uncle."  He also testified that *if you change the television channel when the victim does not want you to, she gets mad,*

*growls, and gives you a mean look.*  Mr. Quay
further explained that when the victim gives
you a mean look it looks like the mean look
that others give.

Jodi Quay, the victim's aunt, testified that
on August 3, 2011, she saw the Defendant and
the victim talking and laughing together,
communicating.  Ms. Quay also testified that
she can communicate with the victim, and *the
victim nods her head for yes and shakes her
head for no.*

At the time the Court reserved ruling on
Defendant's Rule 29 motion, the evidence
showed that the victim was physically able to
communicate her unwillingness to engage in
a sexual act and physically able to decline
participation in a sexual act by head
movements and vocalizations such as
growling.  As in [*State* v. *Fourtin*, 52 A.3d
674 (Conn. 2012)] and [*People* v. *Huure*,
603 N.Y.S.2d 779 (N.Y. App. Div. 1993)], the
government may have been able to present
evidence that the victim was "incapable of
appraising the nature of the conduct"—such
as evidence of mental limitations,
developmental delay, and lack of knowledge
about sex—sufficient to support a conviction
under § 2242(2)(A). But the government did
not charge Defendant under § 2242(2)(A).
The victim's mental limitations likely affected
her ability to know what she should and
should not be unwilling to do, but

§ 2242(2)(B) requires evidence that the victim is *physically incapable* of expressing unwillingness or declining participation. The evidence presented by the government at trial was not sufficient for a jury to reasonably find that the victim was "physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act."

*United States* v. *James*, No. CR-11-08206-PCT-NVW, 2013 WL 5423979, at \*5–\*6 (D. Ariz. Sept. 26, 2013) (emphasis added) (citations omitted).

As the district court recognized, the government simply did not introduce the type of evidence that would allow "*any* rational trier of fact" to conclude that T.C.'s physical limitations rendered her incapable of declining participation or communicating unwillingness. *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979). Significantly, the government never elicited testimony from a witness who knew T.C. that she was physically incapable of expressing her refusal or disagreement. The fact that T.C. was nonresponsive during her medical examination, *see* maj. at 16–17, is wholly irrelevant. *See State* v. *Fourtin*, 52 A.3d 674, 689–90 (concluding that a victim's failure to communicate with physicians "simply is not probative of whether the victim was unable to communicate *to the defendant* that his sexual advances were unwelcome"). The nurse's testimony that T.C. "could not say yes or no" to simple questions tells us nothing about whether T.C. was physically incapable of communicating. All the nurse *observed* was that T.C. did not respond.

It's possible that T.C. didn't comprehend the situation, either when she was with James or with the nurse. *See* maj. at 16–17. But because the government didn't charge James under section 2242(2)(A), T.C.'s mental capacity to "apprais[e] the nature of the conduct" was never at issue before the jury and is not at issue now. We therefore must presume her limitations were purely physical, and that her comprehension of the situation was no different from that of any other adult woman. The majority's periodic references to T.C.'s mental capacity betray its effort to justify James's conviction under a provision he was not charged with violating.

The majority ultimately lists a number of facts that are pretty much beside the point and thus cannot overcome the solid wall of evidence that T.C. was capable of communicating her lack of consent when she was so inclined. For example, the majority's reliance on the fact that T.C.'s caretaker and guardians can't always understand her specific needs, maj. at 5, 16, is not the least bit helpful. Evidence that it's hard to understand T.C.'s "wants or needs" doesn't demonstrate that she is incapable of expressing her unhappiness with a situation. Witnesses familiar with T.C. agreed that she can express disapproval with head nods, grunts, moans, growls, tears and mean looks similar to those given by able-bodied people. The majority is right that the video introduced into evidence "was powerful corroborative evidence for the jury's consideration of the testimony offered by those who knew her best," maj. at 7 n.2: The video confirms that T.C. could express a simple concept like "no" by physically verbalizing that word. While those who knew T.C. testified that people less familiar with her might not be able to understand the exact message she is trying to convey with her growls or grunts, none of them said that she was

unable to communicate a simple concept like "no" by means of head shaking, mean looks, crying or kicking. This testimony, along with the video showing T.C. saying the word "no," gives rise to only one conclusion: T.C. had multiple ways to "communicat[e] unwillingness" that a reasonable person unfamiliar with her could understand.

The majority also notes that "James had to physically lift [T.C.] from the wheelchair to the bed, and then he had to disrobe [her]." Maj. at 17. But this only proves that T.C. was unable to get out of her wheelchair or disrobe herself—which everyone agrees was the case. It has nothing to do with her ability to communicate, verbally or nonverbally. Even if T.C. had affirmatively consented, James would still have had to lift and disrobe her in order to consummate the act.

Finally, the fact that James said T.C. was "just laying there" during intercourse, *see id.*, doesn't show that she *couldn't* say "no." By characterizing the sexual act as "unwanted," *id.*, the majority engages in circular logic: If T.C. was physically capable of declining participation, she would have done so; therefore her failure to resist must mean she couldn't. This begs the question because we don't know that the sexual act was "unwanted." The fact that the government doesn't have to prove nonconsent under section 2242(2)(B) doesn't make lack of evidence of affirmative consent dispositive.

The majority claims that its holding "does not preclude someone suffering from a physical disability from ever having consensual sexual intercourse." Maj. at 18. I'm not so sure. James will go to prison, likely for many years, because he had sex with someone whose physical handicap impaired her ability to communicate, even though those who

knew her testified that she could physically convey the idea of "no" when she wanted to. Today's opinion will make others more reticent about engaging in sex with people who are physically impaired. Their already difficult task of seeking out a partner for sexual gratification will become even more daunting.

Adopting a reading of the statute "that allow[s] more cases to be submitted to the good judgment of a jury" will deter all those who do not wish to submit their lives to the judgment of a jury, which I'm guessing includes most people. T.C. herself, for example, will never have sex again; who'd be foolish enough to risk it? If we're going to let juries impose lifetime sex bans on disabled individuals, it should only be by Congress speaking in far clearer terms. *Cf. City of Cleburne* v. *Cleburne Living Center*, 473 U.S. 432, 442–43 (1985) (noting that how mentally disabled persons "[are] to be treated under the law is . . . very much a task for legislators . . . and not by the perhaps ill-informed opinions of the judiciary").

In the end, the majority faults James for not trying to prove consent as a defense. Maj. at 18–19. But the absence of an affirmative defense does not lower the government's burden to prove the elements of the crime. Because the government didn't (and couldn't) prove one such element beyond a reasonable doubt, I would affirm the sound judgment of the district court.