[603 NYS2d 179]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LEO
HUURRE, Appellant.

Second Department, November 15, 1993

APPEARANCES OF COUNSEL

*Schoer & Sileo,* Syosset *(Gary Schoer* of counsel), for appellant.

*Francis D. Phillips, II, District Attorney* for Orange County, Goshen *(David R. Huey* of counsel), for respondent.

### OPINION OF THE COURT

LAWRENCE, J.

The issue to be decided on this appeal is whether the evidence adduced, when viewed in the light most favorable to the prosecution, is sufficient to establish that the victim, a profoundly retarded individual, is physically helpless, as that term is defined in Penal Law § 130.00 (7), such that the defendant's conviction for sexual abuse in the first degree *(see,* Penal Law § 130.65 [2]) is supported by legally sufficient evidence.

The defendant was convicted, *inter alia,* of sexual abuse in the first degree in that he subjected the victim, a profoundly mentally retarded woman, to sexual contact when she was incapable of consenting to such contact by reason of being physically helpless (Penal Law § 130.65 [2]). On appeal he contends that in drafting Penal Law article 130, the article that deals with sex offenses, the Legislature defined the phrase "incapable of consent" in such a way as to preclude a finding that one who is mentally retarded could be incapable of consenting by reason of being physically helpless (Penal Law § 130.05 [3]). Contrary to the defendant's contention, the fact that an individual is mentally retarded does not, perforce, preclude a finding that she, either as a consequence of or in addition to that retardation, is physically helpless, that is, physically unable to communicate an unwillingness to an act (Penal Law § 130.00 [7]). Here, however, the evidence adduced at trial, when viewed in the light most favorable to the prosecution, is legally insufficient to establish that the victim

was physically unable to communicate unwillingness to an act. In fact, the testimony is to the contrary. Although the victim, by virtue of her retardation, is not able to determine what she should or should not be unwilling to do, the testimony adduced at trial established that when she is unwilling to do something she communicates that unwillingness. Thus, the defendant's conviction for sexual abuse in the first degree must be reversed, and that count of the indictment dismissed.

Under Penal Law § 130.05 (3), a person is deemed to be incapable of consenting to sexual contact when she is (a) less than 17 years of age, (b) mentally defective, (c) mentally incapacitated, or (d) physically helpless. In defining the offense of sexual abuse the Legislature, *inter alia,* employed as a distinguishing factor the manner in which the victim was rendered incapable of consent. Thus, sexual abuse in the first degree occurs when the victim is incapable of consent by reason of being physically helpless *(see,* Penal Law § 130.65 [2]), while sexual abuse in the second degree occurs when the victim is incapable of consent by reason of some factor other than being less than 17 years of age *(see,* Penal Law § 130.60 [1]). One is physically helpless as that term is used in Penal Law § 130.65 (2) when that person is unconscious "or for any other reason is physically unable to communicate unwillingness to an act" (Penal Law § 130.00 [7]).

The victim in this case was a 35-year-old woman with an IQ of 16 to 20, which is the functional equivalent of a three year old and renders her profoundly mentally retarded. In addition, the victim suffers from cerebral palsy and epilepsy, and is nonverbal in the sense that she has no understandable speech, but she does make gutteral noises and is capable of making and understanding a few signs. Essentially, she is capable of doing and understanding that which a three year old can do and understand, except that she does not have the ability to speak. Those who care for the victim testified, however, that her lack of speech does not inhibit her from communicating when she wants or does not want something. Thus, for example, when she was in the hospital after this assault waiting to be examined, she kept crying and pointing away as though she wanted to leave. When the doctor attempted to examine her, she kept trying to get off the examining table and jumped back when he approached her with a tube. The doctor finally became discouraged and left the room without having completed the examination. The victim did receive a complete gynecological examination later that day at the clinic, but in

order to do so she had to be strapped down and her legs held apart by two or three people. Similarly, when the victim is given medicine at the institution in which she resides she often backs away and shakes her head, indicating that she does not want to take the medicine. Another example of the victim's ability to communicate occurred when she cut her head and was taken to the hospital. She covered her wound with her hand when the doctor tried to look at it. Perhaps this most vividly typifies the problem with this case—the victim has the physical ability to communicate her unwillingness to do an act, but she is mentally incapable of determining when she should be willing and when she should be unwilling to do an act.

In support of their theory that the victim was incapable of consent by reason of being physically helpless the People proffered the testimony of Dr. Rudolph Procario, a psychiatrist who had spent approximately one and one-half hours with the victim, but relied for his conclusions, for the most part, on an interview with one of the victim's caretakers. On direct examination Dr. Procario testified that the victim was mentally defective and incapable of making any decisions, a fact that essentially went undisputed by the defendant. He went on to opine that although the victim could grunt and mumble, she was incapable of physically communicating, either verbally or nonverbally.

On cross-examination Dr. Procario testified that the victim communicated her anxiety during the course of his interview by her facial expressions, and that she was able to make her basic needs understood. Despite this, he stood by his conclusion that the victim was not able to "physically, mentally communicate on any level". He went on to testify, however, that the victim had primitive communication skills, such that she was able to point to an empty glass when she wanted some water. When pushed to explain the apparent inconsistency in his testimony, Dr. Procario, seemingly unknowingly, fleshed out a distinction that the trier of fact here failed to grasp—a distinction which requires the reversal of the defendant's conviction of sexual abuse in the first degree. When asked whether the victim would be able to indicate, through physical action, if she did not want to be touched in a certain manner, Dr. Procario responded negatively. Cross-examination then continued as follows:

"Q Now, by that do you mean that she can't move in certain ways?

"A She can move.

"Q Okay. Now, by that do you mean that other people would not be able to understand what she was doing if she was for example moving away?

"A I mean given her level of competency, and her ability to make decisions, she will do whatever you tell her, just as any mental three year old would do. Her IQ is sixteen.

"Q Now, when you say she is of a mental age of a three year old, are you talking about a normal every day three year old?

"A Yes.

"Q And is it your testimony that a normal every day three year old will do anything that you want them to do?

"A I think that a normal three year old is very trusting * * *

"Q * * * Based on your examination and information, would you expect that in a circumstance where a physician was about to give her a pelvic examination, she would in any way resist?

"A She could resist.

"Q Now, would she be able to by her motions let this doctor know that she didn't want him inserting instruments into her?

"A Well, wait a minute. A physical examination is one thing. A loving tender emotion is something else. Now, which way are you asking me? Are you saying strictly physical? Can she kick the doctor away? Yes, she can".

In essence, the doctor testified that if the victim mentally perceives that the situation is threatening she can physically communicate that, but that her mental defect causes her to be unable to determine when she should feel threatened (compare, People v Teicher, 52 NY2d 638 [the defendant's conviction for sexual abuse in the first degree by virtue of the victim having been physically helpless was supported by legally sufficient evidence where the victim, who was under the influence of a sedative which had been administered by the defendant dentist, testified that she was mentally aware of what was happening to her, but that she had no control over her body]).

Of course, there may be situations under which the different factors that cause a victim to become incapable of consent overlap (see, Donnino, Practice Commentaries, McKinney's Cons Laws of NY, Book 39, Penal Law article 130, at 573).

Indeed, one of the psychologists who testified on behalf of the People indicated that while the victim, who is at the high end of the scale which is used to measure profound retardation, has rudimentary communication abilities, there are those on the low end of the scale used to measure profound mental retardation that have none. Such persons may, as a consequence of their mental retardation, or mental defect (see, Penal Law § 130.05 [3] [b]), be physically unable to communicate unwillingness to an act (see, Penal Law § 130.05 [3] [d]; § 130.00 [7]). Here, however, the People failed to establish that such an overlap exists.

Finally, we note that while the victim has a mental age of three years, by virtue of the manner in which the Legislature has structured Penal Law article 130, we are unable to treat her as a three-year-old victim would be treated. We further note that the People adduced legally sufficient evidence to support a conviction for sexual abuse in the second degree on the theory that the victim was unable to consent to sexual contact by reason of a mental defect (see, Penal Law § 130.60 [1]). Unfortunately, after finding the defendant guilty of sexual abuse in the first degree the trial court acquitted the defendant of sexual abuse in the second degree and that count of the indictment was subsequently dismissed. Thus, we are unable to modify the judgment of conviction in that respect.

We have considered the defendant's remaining contentions and find that they are either unpreserved for appellate review or without merit.

ROSENBLATT, J. P., O'BRIEN and RITTER, JJ., concur.

Ordered that the judgment is modified, on the law, by reversing the conviction for sexual abuse in the first degree, vacating the sentence imposed thereon, and dismissing that count of the indictment; as so modified, the judgment is affirmed.