Opinion by Judge TALLMAN; Dissent by Judge KOZINSKI.
OPINION
TALLMAN, Circuit Judge:
Federal law lacks a generic statute addressing nonconsensual rape, as every state has. Instead, 18 U.S.C. § 2241 prohibits aggravated forcible sexual assault. 18 U.S.C. § 2242(2) covers the less frequent scenario where an assailant sexually assaults a victim who is (A) mentally incapable of understanding what is happening, or (B) physically incapable of resisting the assault. Under § 2242(2)(A), sexually assaulting a person whose mental capacity is such that one cannot form the necessary consent in many ways mirrors state statutory rape laws. The other subsection, § 2242(2)(B), however, covers the even more infrequent scenario where the victim who is sexually assaulted may have mental capacity to consent but is incapable of communicating a refusal of unwanted intercourse. We review the latter in greater depth today on a record of heart-wrenching facts.
The district court granted a motion for acquittal after the jury rendered a guilty verdict against Christopher James on two counts of sexual abuse of a severely disabled woman under 18 U.S.C. § 2242(2)(B). The court found insufficient evidence that the victim was “physically incapable” of resisting or declining to participate in the sexual assault by James. We hold that the district court erred in granting that acquittal, although we acknowledge that determining what constitutes physical incapacity under § 2242(2)(B) is a difficult issue of first impression in our circuit. Applying the familiar standard under Jackson v. Virginia, 443 U.S. 307, 320, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), we hold, contrary to the district court’s decision, that there was sufficient evidence to support the jury’s determination by proof beyond a reasonable doubt that James violated the statute under which he was found guilty.
I
T.C.[1] is severely disabled by cerebral palsy. Although T.C. was twenty-eight years old at the time of the sexual assault, she cannot care for herself and needs assistance from others with all of the major activities of daily living, including eating, grooming, and using the bathroom. She cannot walk without assistance. She must be lifted in and out of her wheelchair, into which she is fastened with a seatbelt in order to keep her from falling out when her limbs spasm uncontrollably. When T.C. is in the wheelchair, she can only use her feet to move around. When not in the wheelchair, she “can scoot herself kind of Army style on the floor, or she sits with her legs outward and she’ll hop.” She has no use of her hands and is incapable of lifting heavy objects.
It is difficult even for those who know T.C. to communicate with her or to understand her attempts at speech. T.C.’s tongue is enlarged and her voice box is thicker than normal, thus making her *677 largely non-verbal. She communicates primarily through nodding her head yes or no in response to questions and grunting. Her full time caretaker of eight and one-half years testified that her responses are frequently inappropriate or nonsensical to the questions or situation. Her uncle testified that T.C. sometimes “gets mad” and “kind of like growls and give[s] you the mean look” if he changes a channel away from a program she prefers watching on television. T.C.’s caretaker testified she “kn[ew] about” an instance where T.C. bit a person she did not like, and that T.C. can cry and express anger. When T.C. finishes using the toilet, she will moan or grunt to indicate she is done. These examples are reflective of the extent of T.C.’s communicability.
On August 3, 2011, a family member caught James having sex with T.C. on the porch of her grandparents’ home, covered with only a blanket. The incident occurred inside the boundaries of the Fort Apache Reservation within Indian Country. Because James was adopted by the victim’s grandparents — who also raised T.C. following the death of her mother during childbirth — T.C. is legally James’ niece. The aunt who discovered James lying on top of T.C. called for an ambulance, which rushed T.C. to the nearest clinic for a medical examination. A sexual assault nurse examiner conducted a vaginal examination and observed that T.C. had torn tissue and was bleeding from a laceration. The nurse testified that T.C. was unresponsive to her efforts at the clinic to obtain a medical or event history.
James admitted to investigators that he had sex with T.C. During interviews with an agent from the Bureau of Indian Affairs (“BIA”), James confessed to removing T.C. from her wheelchair and lifting her onto a bed, after which he took off her pants and underpants, pulled down his pants, and penetrated her vaginally with his digit and penis. James also said he had been drinking, he was “ashamed,” and it was not the victim’s fault. In a written statement— introduced at trial — James wrote: “I’m ashamed and confusted [sic]. I don’t know what made me do what I did____I will not forgive me [sic] but I do ask God for forgiveness. [T.C.] is not to bleame [sic] either. She was incent [sic] of all things.” When a BIA agent questioned James about the statement, James responded: “It was intercourse, but it wasn’t like sex, you know? ... [W]ith her, she’s just laying there but, I mean, you are inside her and you are moving up and down.” James also informed the BIA agent that T.C. cannot talk, only “ma[ke] noises.”
Because the sexual assault took place on the Fort Apache Indian Reservation, James could be indicted only by the federal government since the state of Arizona has no jurisdiction there. See United States v. Mitchell, 502 F.3d 931, 946 (9th Cir.2007) (noting that enacted statutes have given the federal government limited jurisdiction over certain major crimes committed on Native American land); cfi 18 U.S.C. § 1162 (noting Arizona is not one of the six enumerated states that have “jurisdiction over offenses committed by or against Indians in the areas of Indian country”). On November 1, 2011, a federal grand jury returned an indictment charging James with two counts of sexual abuse in violation of 18 U.S.C. § 2242(2)(B). For reasons unknown, the Government did not charge James in the indictment under § 2242(2)(A), nor did it offer an expert at trial to establish her cognitive impairments, relying instead on lay testimony from family members, caregivers, the nurse, and the BIA agent.
A three-day jury trial began on July 30, 2013. The investigating BIA agent testified that he was unable to ask T.C. about *678 the event because he could not communicate with her, but he videotaped his contact with her and that was shown to the jury during the trial.[2] The jury returned a guilty verdict on both counts of sexual abuse. Though James moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a) both at the close of the Government’s case and again at the close of trial, the district court reserved its ruling on both occasions to await the jury’s verdict. The jury convicted. After post-trial briefing and oral argument, the district court granted James’ Rule 29 motion and entered its Judgment of Acquittal on September 26, 2013. The Government timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.
II
We review de novo a district court’s ruling on a motion for acquittal. United States v. Sanchez, 639 F.3d 1201, 1203 (9th Cir.2011). We review evidence presented against the defendant in the light most favorable to the Government to determine whether “any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” United States v. Mincoff, 574 F.3d 1186, 1192 (9th Cir.2009) (internal quotation omitted).
III
Congress promulgated 18 U.S.C. § 2242 in 1986 as part of its effort to “modernize and reform Federal rape statutes.” H. Rep. No. 99-594, at 6 (1986). It states in relevant part:
Whoever, in the special maritime and territorial jurisdiction of the United States[3] ... knowingly — .
(1) causes another person to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping); or
(2) engages in a sexual act with another person if that other person is—
(A) incapable of appraising the nature of the conduct; or
(B) physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act;
or attempts to do so, shall be fined under this title and imprisoned for any term of years or for life.
18 U.S.C. § 2242 (emphasis added).[4] Because the’ Government indicted James under only subsection (2)(B) — physical incapacity — rather than subsection (2)(A)— mental incapacity — the jury could convict *679 James only if it deemed T.C. physically incapable of resisting or communicating her lack of consent.
This case turns on the breadth of the “physically incapable” standard in § 2242(2)(B) for punishing a sexual act with an individual with the physical incapacity to decline participation in or communicate unwillingness to engage in the act.[5] The statutory definitions provided in 18 U.S.C. § 2246 do not define “physically incapable,” nor did Congress provide context for this term in the legislative history. While no federal court has definitively addressed the issue, we hold that “physically incapable” under § 2242(2)(B) should be defined broadly and not confused with the more narrow “physically helpless” standard employed by the district court. As so interpreted, we think the Government provided sufficient evidence to permit the question to proceed to the jury. The resulting guilty verdict meets the standard of Jackson. See Jackson, 443 U.S. at 320, 99 S.Ct. 2781.
Due to the lack of congressional direction and germane federal precedent, the district court opted to draw a parallel between the federal statute’s “physically incapable” language and the “physically helpless” language employed by some states in their rape schemes — holding essentially that T.C. would need to be totally physically helpless in order for the jury to convict James under § 2242(2)(B). See, e.g., Conn. Gen.Stat. § 53a—71 (a)(3); N.Y. Penal Law § 130.35(2). The district court may have relied on this parallel because some states’ definitions of “physically helpless” similarly discuss an inability to communicate. For example, both Oregon and New York define the term “physically helpless” as “a person [who] is unconscious or for any other reason is physically unable to communicate unwillingness to [engage in a sexual] act.” Or.Rev.Stat. § 163.305; N.Y. Penal Law § 130.00(7); see also Tenn.Code § 39-13-501(5).
But relying on state law as the district court did is problematic. First, the Supreme Court has held that “in the absence of a plain indication of an intent to incorporate diverse state laws into a federal criminal statute, the meaning of the federal statute should not be dependent on state law.” United States v. Turley, 352 U.S. 407, 411, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957); see also Taylor v. United States, 495 U.S. 575, 591, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). We find this guidance particularly applicable here. State law statutory schemes are very different from federal law because state law punishes the broad category of non-consensual rape— but federal law has no such counterpart. Noticeably absent from 18 U.S.C. § 2242 is a provision punishing non-consensual sexual intercourse. The scope of conduct punished by federal law is therefore narrower than the scope of conduct punished by state law. See United States v. Cabrera-Gutierrez, 756 F.3d 1125, 1134 (9th Cir.2014) (“Nonconsensual intercourse with a mentally and physically capable individual not involving a threat or the use of fear might violate Or.Rev.Stat. § 163.425, but it would not violate 18 U.S.C. § 2242.”).
Second, the district court followed the line of state ease law that construes the *680 term “physically helpless” very narrowly. See State v. Fourtin, 307 Conn. 186, 52 A.3d 674 (2012); People v. Huurre, 193 A.D.2d 305, 603 N.Y.S.2d 179 (N.Y.App.Div.1993). Although both cases involved victims who suffer from cerebral palsy as T.C. does, the district court ignored the differences between the legal terms “physically incapable” and “physically helpless.” In Fourtin, a 4-3 decision, the majority held a woman who could not walk or talk nonetheless failed to meet the physically helpless standard because she could non-verbally communicate her unwillingness to engage in the sexual act by biting, kicking, and screaming. 307 Conn. 186, 52 A.3d at 689. Rather than apply a common sense interpretation of the term, Fourtin explained that “ ‘physically helpless’ has a particular statutory meaning that requires more than a showing that a victim is totally physically incapacitated.” Id. (emphasis added); see also id. at 682 (“[N]o one would dispute that the victim is physically helpless in the ordinary sense of that term.”). In Huurre, the state appellate court held that the victim was able to nonverbally communicate her unwillingness to do something by making guttural noises. 603 N.Y.S.2d at 306-07. Although the state had not sustained its burden in presenting evidence sufficient to demonstrate the victim was physically helpless, Huurre noted that the state had sustained its burden of showing an inability to consent “by reason of a mental defect.” Id. at 310, 603 N.Y.S.2d 179.[6]
However, the term “physically helpless” has various interpretations in other states. See, e.g., Dabney v. State, 326 Ark. 382, 930 S.W.2d 360 (1996) (rejected by the majority in Fourtin). Dabney found evidence sufficient to find the victim physically helpless where she was “blind, mentally impaired, partially handicapped, and unable to speak,” and “could only grunt, raise her hand, and shake her head from side to side.” Id. at 361-62. “Granted, the victim was not completely physically incapacitated, but this is not what the statute requires; it only requires physical helplessness, not total incapacity.” Id. at 362. As another example, Iowa punishes sex with an individual who is “mentally incapacitated, physically incapacitated, or physically helpless.” Iowa Code § 709.4(d). The state defines these terms separately: “Physically helpless” means a person who “is unable to communicate an unwillingness to act because the person is unconscious, asleep, or is otherwise physically limited,” and “[pjhysically incapacitated” means a person who “has a bodily impairment or handicap that substantially limits the person’s ability to resist or flee.” Id. § 709.1A. These statutes demonstrate that the concept of being “physically helpless” *681 need not be as narrow as defined by Connecticut or New York and that “physically incapable” is a separate, broader standard.
Nothing compels us to adopt Connecticut and New York’s narrow formulation of “physically helpless” over the broader approach taken by other states. The federal statute itself does not use the term “physically helpless” and the district court erred in defining “physically incapable” so narrowly. “Physically helpless” and “physically incapable” are two separate standards. “Physically helpless” suggests a lack of physical ability to do anything while “physically incapable” is a term that is more susceptible to application to various factual situations that can come before a jury. A victim could have a physical incapacity to decline participation or be incapable of communicating unwillingness to engage in a sexual act and still not be physically helpless.
We find our support in differentiating the broader “physically incapable” standard from the more narrow “physically helpless” standard relied upon by the district court when we look to federal applications of § 2242(2)(B). For example, we have held in the context of sentencing that a defendant had committed an act in violation of § 2242 where the victim “repeatedly gained and lost consciousness” and “was unconscious or nearly so” when the defendant engaged in intercourse with her. United States v. Morgan, 164 F.3d 1235, 1237-38 (9th Cir.1999). The Eighth Circuit has similarly held that sufficient evidence supported finding the victim physically incapable where “the lingering effects of the marijuana may have hindered her ability to object straightaway to the abuse,” even though the victim was conscious at the time of the sexual assault. United States v. Carter, 410 F.3d 1017, 1028 (8th Cir.2005); see also United States v. Barrett, 937 F.2d 1346, 1348 (8th Cir.1991) (upholding conviction where the victim, though not fully awake until penetration, “vaguely remember[ed] someone pulling off her jeans and underwear”).
These federal cases support our conclusion by indicating that a defendant may be convicted under § 2242(2)(B) where the victim had some awareness of the situation and — while not completely physically helpless — was physically hampered due to sleep, intoxication, or drug use and thereby rendered physically incapable.[7]
Most compellingly, “whether a victim is physically helpless at any given moment is largely a question of fact for the jury to decide.” Fourtin, 307 Conn. 186, 52 A.3d at 695 (Norcott, Eveleigh, & Harper, JJ., dissenting) (quoting State v. Stevens, 311 Mont. 52, 53 P.3d 356, 361 (2002)); see also State v. Tapia, 751 N.W.2d 405, 407 (Iowa Ct.App.2008) (same); State v. Rush, 278 N.J.Super. 44, 650 A.2d 373, 374 (App.Div.1994) (“It is thus for the jury and not the judge to determine whether, as a matter of fact, a victim’s condition meets the physically helpless standard.”). The district court wisely deferred making a final decision until after the jury had spoken. It erred on this record by not abiding by its verdict.
*682 After surveying the dearth of case law, we find the cases more persuasive which punish conduct under the broader “physically incapable” standard rather than the narrower “physically helpless” standard because it will allow more cases to be submitted to the good judgment of a jury. A jury could properly convict under § 2242(2)(B) for sexual acts committed against a victim who cannot verbally articulate her lack of consent — “physically incapable of communicating unwillingness”— as well as a victim who cannot physically resist the sexual act — “physically incapable of declining participation.” We hold that the district court erred by, in essence, requiring the Government to prove T.C. was physically helpless in order to allow the jury’s verdict to stand.
IV
Now that we have settled the proper legal standard, applying the facts of this case is straightforward. We hold that the Government proffered sufficient evidence — when viewed in the light most favorable to it — to allow a rational juror to conclude beyond a reasonable doubt that T.C. was physically incapable of declining participation in, or communicating her unwillingness to engage in, a sexual act with James. See Jackson, 443 U.S. at 320, 99 S.Ct. 2781.
The Government presented evidence that witnesses — even those who knew her well — could not always understand T.C. Cf. Fourtin, 307 Conn. 186, 52 A.3d at 680 (reasoning that “all the ... witnesses testified that, sometimes with the aid of a communication board and at other times, with appropriate gestures, the [victim] was able to make herself understood.” (alterations in original)). Although James was T.C.’s uncle by adoption, he had never resided with her, and the evidence demonstrated they never spent any appreciable time together before James sexually assaulted her. Nothing indicates he knew her well enough to understand her or could otherwise understand her attempts at communication.
Furthermore, while T.C. had some minimal means of communicating, the evidence demonstrated that she had difficulty communicating even with her longtime caregivers, close family members, the emergency room nurse, and investigators. During the physical examination after the attack, T.C. could not communicate with the treating nurse — even through yes or no questions — nor did she seem to understand the nurse’s inquiries or directives. James himself admitted that she was like a limp doll who “just lay[ ] there” during his assault. Thus, the facts presented at trial are sufficient to permit a juror to find that T.C.’s cerebral palsy was sufficiently severe that it rendered her incapable of being understood by others, and thereby incapable of communicating to James her unwillingness to participate in the sexual act.
The evidence also suffices to show that T.C. was physically incapable of declining participation in a sexual act with James. T.C. does not have use of her arms, cannot lift heavy objects, and would not be capable of pushing someone off who was lying on top of her. She is unable to feed or groom herself. She cannot walk nor get into or out of her wheelchair without assistance. James had to physically lift her from the wheelchair to the bed, and then he had to disrobe the victim before penetration. The facts presented at trial would permit a rational juror to find that T.C.’s cerebral palsy rendered her physi- *683 eally incapable of declining participation in this unwanted sexual act.[8]
V
We emphasize that our holding does not preclude someone suffering from a physical disability from ever having consensual sexual intercourse. Someone may suffer from a physical disability and retain sufficient mental functional capacity to consent. It is one thing to impose per se legal violations with respect to minors and those who cannot comprehend the nature of the act under § 2242(2)(A); it is quite another to say the law is designed in this manner for individuals who suffer solely from a physical disability.
The legislative history of § 2242(2) is clear that “[llack of consent by the victim is not an element of the offense, and the prosecution need not introduce evidence of lack of consent or of victim resistance.” H. Rep. No. 99-594, at 16 (emphasis added). This makes sense, as it would be very difficult to prove a sleeping or intoxicated person — who could not provide any verbal or non-verbal cues — did not consent to the sexual act. But we do not think this means that in the case of a severe physical disability the jury cannot consider the presence of consent when determining physical incapacity.
We hold that — to the extent a defendant raises a factual dispute regarding consent as a defense under § 2242(2)(B)— the jury is the appropriate fact-finder to weigh the question when evaluating the victim’s physical incapacity to decline participation or communicate her unwillingness to engage in the alleged sexual abuse. See, e.g., United States v. Fasthorse, 639 F.3d 1182, 1185 (9th Cir.2011) (“Although Fasthorse testified that the victim ‘wasn’t asleep’ and consented to the sexual act, the jury rejected his version of events.”). Here, James never raised consent as a defense and, in fact, conceded “it wasn’t like sex” because “she’s just laying there [while] you are inside her and you are moving up and down.” The district court erred by taking the question out of the jury’s domain after it had rendered a guilty verdict against James, and we now vacate that ruling and remand to reinstate the verdict.
VI
The law in its majesty protects from assault those who are too weak and feeble to protect themselves. No society worthy of being called civilized may do any less. We reverse, vacate the judgment of acquittal, order reinstatement of the jury verdict, and direct the district court to proceed to sentencing.
REVERSED, VACATED, and REMANDED with instructions.

. In order to protect the victim’s privacy, we refer to her solely by her initials throughout this opinion. We summarize the facts in the light most favorable to the prosecution in support of the jury's verdict. See United States v. Dearing, 504 F.3d 897, 900 (9th Cir.2007).

.The Government submitted two videos that were admitted into evidence at trial: (1) clips of T.C. at her school taken near the time of the incident with James; and (2) the attempted "interview” between the BIA agent and T.C. filmed after the incident. Both of these videos, particularly the latter, demonstrate examples of T.C.’s extreme physical limitations and her inability to provide a narrative as to what happened. This was powerful corroborative evidence for the jury's consideration of the testimony offered by those who knew her best as to whether she was physically incapable of declining participation in, or communicating her unwillingness to engage in, sexual acts with James. She was not called as a witness at trial for the same reasons.

. The "special maritime and territorial jurisdiction of the United States” includes Indian Country. United States v. Begay, 42 F.3d 486, 498 (9th Cir.1994).

. 18 U.S.C. § 2241 proscribes aggravated sexual abuse, which includes causing another person to engage in a sexual act (a) by force or threat, (b) by rendering the victim unconscious (e.g., by a drug), or (c) when the victim is a child.

. The dissent appears to suggest we should apply the rule of lenity in interpreting this statute. See Dissent at 684. However neither we or the dissent find the statute ambiguous. Id. ("What this means is perfectly clear.”). Therefore, the rule of lenity does not apply. See United States v. Shabani, 513 U.S. 10, 17, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994) ("The rule of lenity, however, applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute.”). The question is whether the evidence was sufficient to convict James under 18 U.S.C. § 2242(2)(B).

. Critically, states like Connecticut and New York can afford to be narrow in their interpretation of "physically helpless” because they have other statutes that address conduct where a physically restrained or disabled victim verbally or non-verbally indicates lack of consent. See, e.g., People v. Morales, 139 Misc.2d 200, 528 N.Y.S.2d 286, 286-87 (N.Y.Sup.Ct.1988) (dismissing one count because the victim, who "suffers from muscular dystrophy rendering her paralyzed from the neck down and wheelchair hound,” was not physically helpless, but sustaining indictment for forcible rape); State v. Hufford, 205 Conn. 386, 533 A.2d 866, 869-72, 873-74 (1987) (setting aside guilty verdict for sexual contact with a woman restrained on a stretcher due to insufficient evidence she was "physically helpless” and of use of force to compel the sexual contact, but remanding for new trial to determine guilt under non-cOnsensual sexual assault statute); see also State v. Bucknell, 144 Wash.App. 524, 183 P.3d 1078, 1081-82 (2008) (reversing rape conviction because victim, who suffered from ALS and "was bedridden and unable to move from her chest down,” was not physically helpless, but remanding for entry of judgment on a lesser charge of non-consensual sexual intercourse).

. In contrast to our situation involving a developmentally disabled woman, the law is well established that a sexual act with one who is physically incapable due to sleep, intoxication, or drug use is punishable under § 2242(2)(B). See United States v. Fasthorse, 639 F.3d 1182, 1184 (9th Cir.2011) (citing United States v. Wilcox, 487 F.3d 1163, 1169 (8th Cir.2007)) (affirming .conviction even where the victim woke up while the sexual act was ongoing); Carter, 410 F.3d at 1027-28. Contra United States v. Peters, 277 F.3d 963, 967 (7th Cir.2002).

. The dissent highlights evidence that could support an acquittal. Dissent at 685-86. While that evidence might support a conclusion that T.C. was capable of communicating her unwillingness to participate in the sexual act, the jury heard this evidence and did not credit it. We must presume "that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir.2010) (en banc) (quoting Jackson v. Virginia, 443 U.S. 307, 326, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). "[A] court of appeals may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial.” Id. The evidence is sufficient under Jackson to support the jury's conclusion.