KOZINSKI, Circuit Judge,
dissenting:
I am puzzled and confused by Part III of the opinion. My colleagues work hard to prove that the district court read 18 U.S.C. § 2242(2)(B) too narrowly, but I’m not sure how the majority’s reading is any *684 different from that of the district court— or mine, for that matter. The whole enterprise seems misguided because the statute is clear and thus not reasonably susceptible to conflicting interpretations.
Here’s what the statute says:
Whoever ... knowingly ... engages in a sexual act with another person if that other person is ... physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act ... shall be fined under this title and imprisoned for any term of years or for life.
18 U.S.C. § 2242. What this means is perfectly clear: The government must prove that the alleged victim had a physical impairment and that this impairment made it impossible for her to say no to (“communicat[e] unwillingness to engage in”) or otherwise indicate nonconsent to (“deelin[e] participation in”) sexual acts. There must be enough evidence for the jury to find beyond a reasonable doubt that the victim could not indicate, by word or deed, her lack of assent to a proposed sexual contact. Insofar as the majority tries to squeeze any more meaning out of these words — such as the possibility that the government could prove a violation by showing the victim could not actually fight off her assailant, see maj. at 679, 682-83 — I must respectfully disagree. The statute is simply not susceptible to any such interpretation.
I also disagree with the methodology employed by the majority in seeking to pump up the statute beyond its ordinary meaning. The majority purports to find the statute crystal clear, maj. at 679 n. 5, but then decides it must pick between broader and narrower interpretations of the statutory language. It opts for the broader one because “it will allow more cases to be submitted to the good judgment of a jury.” Id. at 682. This rule of acerbity, ie., the rule of lenity stood on its head, is not how the criminal law is supposed to work. People must have fair notice of what is legal and what is illegal, which is why we apply the rule of lenity when confronted with an ambiguous criminal statute. See Liparota v. United States, 471 U.S. 419, 427, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). The function of the jury is to find facts and determine guilt by applying known legal standards, not to make up the law as it goes along. The majority’s “let the jury decide what’s illegal” approach is unwise and, most likely, unconstitutional. I emphatically disapprove of it.
The majority finds yet another reason for giving section 2242(2)(B) a capacious interpretation: According to the majority, we must read section 2242(2)(B) more broadly than analogous state laws because “state law punishes the broad category of non-consensual rape — but federal law has no such counterpart.” Maj. at 679. This is a legislative choice Congress was free to make; it gives us no license to stretch other provisions of federal law beyond their natural meaning. The question “is not what Congress would have wanted but what Congress enacted.” Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (internal quotation marks omitted). Our task is to construe the language as written, not to fill in what we perceive to be gaps in the sthtute.
In any event, all of these interpretive calisthenics are beside the point. As I said at the outset, the statute speaks for itself: A jury can convict only if it has proof that the victim could not physically express her lack of consent to the defendant’s sexual advances. Because the government chose to prosecute James under subsection (2)(B) (dealing with physical incapacity) rather than subsection (2)(A) *685 (dealing with mental incapacity), we must assume that T.C. was capable of understanding and consenting to sexual intercourse with James. The only question is ■whether she was able to communicate lack of consent if she chose not to participate.
It’s quite clear that the district judge understood and applied this standard. I can do no better than to quote the district judge’s own review of the evidence:
In her opening statement, the government’s counsel said, “[The victim] communicates primarily nonverbally with gestures and sounds. She can say yes or no.” The government’s witnesses included Special [Agent] Adrian Jim, Patricia Shands, Mark Quay, and Jodie Quay.
Special Agent Adrian Jim testified that when he first met with the victim, she was crying and “[i]t didn’t seem like she wanted to talk to us.” He testified that he interviewed the victim on a second visit, and the video recording of the second interview was played for the jury. The video showed the victim nodding her head in agreement and shaking her head for disagreement. Special Agent Jim testified that during the second interview the victim responded to his questions by nodding her head for yes and shaking her head for no.
Patricia Shands, the victim’s direct caregiver, testified that part of the victim’s school program involvfed] practicing language skills, such as “sounding out our ABCs and her vowels,”, working on the alphabet, and using flash cards with pictures to practice the sounds of letters. Ms. Shands testified that when the victim gets out of her wheelchair, she chooses where she wants to sit. Ms. Shands also testified that the victim requires assistance to use the toilet, but “she’ll moan when she’s done” so that a caregiver can help her get back to her wheelchair. Ms. Shands testified that the victim can talk, but sometimes she has difficulty understanding the victim, and it is easier for the victim to show you something than to tell you. She also testified that the victim has many friends at school, and she can express anger and dislike for someone. Ms. Shands testified that the victim communicates by nodding or shaking her head and making grunting sounds. She further testified that the victim can communicate her needs and desires, such as when she needs to go to the bathroom, when she is finished using the toilet, when she wants to go play on the computer, when she wants to play games, when- she wants to do something, and when she does not want to do something.
Mark Quay, the victim’s uncle, testified that the victim understands both English and Apache and responds to questions by nodding her head for yes and shaking her head for no. _ He testified that she does not talk much, but she can talk. Mr. Quay testified that sometimes she expresses that she loves him by hugging him. He said that when he comes to her house, she always points at him and says “Mark” or “uncle.” He also testified that if you change the television channel when the victim does not want you to, she gets mad, growls, and gives you a mean look. Mr. Quay further explained that when the victim gives you a mean look it looks like the mean look that others give.
Jodi Quay, the victim’s aunt, testified that on August 3, 2011, she saw the Defendant and the victim talking and laughing together, communicating. Ms. Quay also testified that she can communicate with the victim, and the victim nods her head for, yes and shakes her head for no.
*686 At the time the Court reserved ruling on Defendant’s Rule 29 motion, the evidence showed that the victim was physically able to communicate her unwillingness to engage in a sexual act and physically able to decline participation in a sexual act by head movements and vocalizations such as growling. As in [State v. Fourtin, 307 Conn. 186, 52 A.3d 674 (2012)] and [People v. Huurre, 193 A.D.2d 305, 603 N.Y.S.2d 179 (1993)], the government may have been able to present evidence that the victim was “incapable of appraising the nature of the conduct” — such as evidence of mental limitations, developmental delay, and lack of knowledge about sex — sufficient to support a conviction under § 2242(2)(A). But the government did not charge Defendant under § 2242(2)(A). The victim’s mental limitations likely affected her ability to know what she should and should not be unwilling to do, but § 2242(2)(B) requires evidence that the victim is physically incapable of expressing unwillingness or declining participation. The evidence presented by the government at trial was not sufficient for a jury to reasonably find that the victim was “physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act.”
United States v. James, No. CR-11-08206-PCT-NVW, 2013 WL 5423979, at *5-*6 (D.Ariz. Sept. 26, 2013) (emphasis added) (citations omitted).
As the district court recognized, the government simply did not introduce the type of evidence that would allow “any rational trier of fact” to conclude that T.C.’s physical limitations rendered her incapable of declining participation or communicating unwillingness. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Significantly, the government never elicited testimony from a witness who knew T.C. that she was physically incapable of expressing her refusal or disagreement. The fact that T.C. was nonre-sponsive during her medical examination, see maj. at 682-83, is wholly irrelevant. See State v. Fourtin, 307 Conn. 186, 52 A.3d 674, 689-90 (concluding that a victim’s failure to communicate with-physicians “simply is not probative of whether the victim was unable to communicate to the defendant that his sexual advances were unwelcome”). The nurse’s testimony that T.C. “could not say yes or no” to simple questions tells us nothing about whether T.C. was physically incapable of communicating. All the nurse observed was that T.C. did not respond.
It’s possible that T.C. didn’t comprehend the situation, either when she was with James or with the nurse. See maj. at 682-83. But because the government didn’t charge James under section 2242(2)(A), T.C.’s mental capacity to “apprais[e] the nature of the conduct” was never at issue before the jury and is not at issue now. We therefore must presume her limitations were purely physical, and that her comprehension of the situation was no different from that of any other adult woman. The majority’s periodic references to T.C.’s mental capacity betray its effort to justify James’s conviction under a provision he was not charged with violating.
The majority ultimately lists a number of facts that are pretty much beside the point and thus cannot overcome the solid wall of evidence that T.C. was capable of communicating her lack of consent when she. was so inclined. For example, the majority’s reliance on the fact that T.C.’s caretaker and guardians can’t always understand her specific needs, maj. at 676-77, 682, is not the least bit helpful. Evidence *687 that it’s hard to understand T.C.’s “wants or needs” doesn’t demonstrate that she is incapable of expressing her unhappiness with a situation. Witnesses familiar with T.C. agreed that she can express disapproval with head nods, grunts, moans, growls, tears and mean looks similar to those given by able-bodied people. The majority is right that the video introduced into evidence “was powerful corroborative evidence for the jury’s consideration of the testimony offered by those who knew her best,” maj. at 678 n. 2: The video confirms that T.C. could express a simple concept like “no” by physically verbalizing that word. While those who knew T.C. testified that people less familiar with her might not be able to understand the exact message she is trying to convey with her growls or grunts, none of them said that she was unable to communicate a simple concept like “no” by means of head shaking, mean looks, crying or kicking. This testimony, along with the video showing T.C. saying the word “no,” gives rise to only one conclusion: T.C. had multiple ways to “communicat[e] unwillingness” that a reasonable person unfamiliar with her could understand.
The majority also notes that “James had to physically lift [T.C.] from the wheelchair to the bed, and then he had to disrobe [her].” Maj. at 682. But this only proves that T.C. was unable to get out of her wheelchair or disrobe herself — which everyone agrees was the case. It has nothing to do with her ability to communicate, verbally or nonverbally. Even if T.C. had affirmatively consented, James would still have had to lift and disrobe her in order to consummate the act.
Finally, the fact that James said T.C. was “just laying there” during intercourse, see id., doesn’t show that she couldn’t say “no.” By characterizing the sexual act as “unwanted,” id., the majority engages in circular logic: If T.C. was physically capable of declining participation, she would have done so; therefore her failure to resist must mean she couldn’t. This begs the question because we don’t know that the sexual act was “unwanted.” The fact that the government doesn’t have to prove nonconsent under section 2242(2)(B) doesn’t make lack of evidence of affirmative consent dispositive.
The majority claims that its holding “does not preclude someone suffering from a physical disability from ever having consensual sexual intercourse.” Maj. at 683. I’m not so sure. James will go to prison, likely for many years, because he had sex with someone whose physical handicap impaired her ability to communicate, even though those who knew her testified that she could physically convey the idea of “no” when she wanted to. Today’s opinion will make others more reticent about engaging in sex with people who are physically impaired. Their already difficult task of seeking out a partner for sexual gratification will'become even more daunting.
Adopting a reading of the statute “that allow[s] more cases to be submitted to the good judgment of a jury” will deter all those who do not wish to submit their lives to the judgment of a jury, which I’m guessing includes most people. T.C. herself, for example, will never have sex again; who’d be foolish enough to risk it? If we’re going to let juries impose lifetime sex bans on disabled individuals, it should only be by Congress speaking in far clearer terms. Cf. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 442-43, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (noting that how mentally disabled persons “[are] to be treated under the law is ... very much a task for legislators ... and not by the perhaps ill-informed opinions of the judiciary”).
*688 In the end, the majority faults James for not trying to prove consent as a defense. Maj. at 683. But the absence of an affirmative defense does not lower the government’s burden to prove the elements of the crime. Because the government didn’t (and couldn’t) prove one such element beyond a reasonable doubt, I would affirm the sound judgment of the district court.